VAN BUREN BARTLEY and ROBERT HILL, JR.
v. STATE OF MARYLAND

[No. 523, September Term, 1975.]

*Decided July 23, 1976.*

284

The cause was argued before THOMPSON, MOORE, MELVIN and MASON, JJ.

*James L. Baer, Assigned Public Defender,* for appellant Bartley. *Courtland K. Townsend, Jr., Assigned Public Defender,* for appellant Hill.

*Michael James Kelly, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Irma S. Raker, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

On December 20, 1972, Andrew Der, age 17, was accosted in front of his residence in Silver Spring, Maryland, by a black male wearing a long coat and carrying a rifle. The accoster was joined by four more black males, one of whom had another rifle. The five individuals robbed Der of his watch, his keys and his wallet containing money and various cards. At gun point Der was then forced to enter the house accompanied by the five individuals. Der's mother and father, Paul and Marietta Der, also resided in the home and were at home at the time. The three Ders were then bound and gagged while the five intruders ransacked the house for valuables. The five men remained in the house about 20

minutes. During that time Mrs. Der was subjected to sexual assaults by at least three of the assailants. When the culprits were ready to leave the premises, they took the keys to Paul Der's Volkswagen automobile and drove away in it, taking with them various other articles of personal property belonging to the Ders.

On January 3, 1973, the appellants, Van Buren Bartley and Robert Hill, Jr., were indicted by the Grand Jury of Montgomery County, charging them with various counts of armed robbery, robbery, larceny, assault with intent to rape, unnatural perverted sex acts, assault and battery, assault and larceny of a motor vehicle, all related to the events that took place at the Der household on December 20, 1972.

On November 25, 1974, the appellants were brought to trial and a jury selected and impaneled (McAuliffe, J. presiding). During opening statement, the prosecutor informed the jury that one Alfred Truesdale would be the State's first witness; that Truesdale "is one of the persons who perpetrated this horrible crime"; that Truesdale "was there and he will tell you who was there with him. He will tell you he was there with George Bartley, with Peter Hackett, *and that he was there with Robert Hill, Jr., the defendant that's here in this Court before you today. And that he was there with Van Buren Bartley that night and they all came up and they all took part in this crime".* (Emphasis added.)

After defense counsel [1] had completed their opening statements and after Truesdale was called as a witness but before he took the stand to testify, both defense counsel were permitted to "voir dire him out of the presence of the jury on the in-Court identification . . ." he was expected to make. Following the voir dire the court recessed for the day. The next day the prosecutor informed the court that Truesdale "did not wish to testify in this case".

> "On that basis, I request the Court to grant a mistrial in light of the fact that I believe Alfred

---

1. Appellants were represented by separate counsel both below and before this Court.

Truesdale would testify in behalf of the State. I had spoken with him and he assured me he would testify truthfully at the trial, and I mentioned it in opening statement."

Judge McAuliffe was reluctant to declare a mistrial. The record reflects his concern:

"THE COURT: ... Ordinarily, Mr. Truesdale would be a compellable State's witness and a competent State's witness as would the other two persons[2] previously convicted in this case because there could be no claim as to self-incrimination by them, their cases having been finally decided and the appeal time having run.

"However, it is also my recollection that at the time the sentence was taken, or at the time the plea was taken and sentence imposed in the case of the other three, it was part of their negotiated plea bargain with the State that they would not be called against their will, if I am not mistaken about that. Otherwise, I would think you could call Mr. Truesdale from the stand and make him testify.

"My understanding is that he is now at least a reluctant witness and won't testify, and the State doesn't propose to call him.

"MRS. RAKER: That is correct, your Honor.

"THE COURT: I indicated to you in chambers I would be reluctant to grant the State's motion for a mistrial unless the defendants concurred therein, or individually made a motion for mistrial.

"What is your pleasure? You know the State's Attorney has mentioned the testimony of Mr. Truesdale in opening.

"MR. BERNSTEIN: *On behalf of the defendant Van Buren Bartley, I would move for a mistrial, or join in the motion of the State for mistrial.* I feel that comments made in the opening statement as to

---

2. George Bartley and Peter Hackett.

what Mr. Truesdale would testify to were very strong and it would seem to me that in the interest of justice, the Court must grant the mistrial.

"It is what is in the mind of the jurors and the jurors today are not that unsophisticated. They will probably get the impression, for some reason, Mr. Truesdale did not want to testify to help the two defendants.

"Accordingly, I would have Mr. Bartley ask for a mistrial.

"THE COURT: *You discussed this with Mr. Bartley this morning?*

"MR. BERSTEIN: *Yes, I have.*

"THE COURT: Mr. Townsend?

"MR. TOWNSEND: On behalf of the defendant, Robert Hill, Jr., whom I have also discussed this with at some substantial length, I move for a mistrial for the same reasons cited and that the Court is familiar with. Mr. Hill concurs in our judgment to make that motion.

"THE COURT: Gentlemen, it is unfortunate but I agree once having . . . [placed] it in the jurors mind what the testimony of an accomplice would have been, that to not call that accomplice is to leave lingering in the jurors mind something which might well turn the scales against your clients. It is inadvertent and not deliberate on the part of the State, but the Court will grant each defendant's motion for mistrial and direct the jurors be withdrawn." (Emphasis added.)

The judge then declared a mistrial, the docket entries reflecting as follows:

"State's motion for mistrial — no ruling
Defendant Van Buren Bartley's motion for mistrial — granted
Defendant Robert Hill, Jr.'s motion for mistrial granted, Jury withdrawn."

On February 10, 1975, appellants were again brought to trial on the same indictment (McAuliffe, J. again presiding). Each appellant moved for dismissal on the ground of double jeopardy. Judge McAuliffe reserved his ruling on the motions and the case proceeded to trial by jury. At the close of the State's case, neither appellant presented any evidence; each elected not to testify in his own defense.

On February 14, 1975, after four days of trial, the jury found each appellant guilty of three counts of armed robbery, assault with intent to rape, an unnatural and perverted sex act, assault and battery, assault, and larceny of a motor vehicle.

On March 17, 1975, each appellant's motion for a new trial was denied. At the same time, the court denied each motion for dismissal on the ground of double jeopardy upon which it had reserved its rulings at the commencement of the trial. On April 16, 1975, each appellant received sentences totaling 20 years.

In their timely appeals to the Court, neither appellant contests the evidence as it relates to the *corpus delicti* of the crimes of which they were convicted. Each, however, vigorously contend that the trial court committed reversible error in its rulings on the admissibility of all evidence identifying each of them as being present at the Der home on December 20, 1974. Both also contend the trial judge erred in not granting their motions for dismissal or, in the alternative, a mistrial, because of an alleged violation of the witness sequestration rule (Md. Rule 753). In addition, appellant Bartley (but not Hill) contends on appeal that "the trial judge erred in refusing to dismiss the indictment after the defendant was placed twice in jeopardy". We shall discuss this latter contention first.

I

*Appellant Bartley's Double Jeopardy Claim*

In *Jourdan v. State*, 275 Md. 495 (1975), the Court of Appeals said, at 508:

"... [W]here jeopardy has attached to a criminal

defendant and a mistrial is thereafter declared, the determination of whether the Fifth Amendment's prohibition against double jeopardy bars a retrial depends upon the reasons for and circumstances surrounding the mistrial declaration.

"One circumstance where a retrial is normally permitted after a mistrial, without further examination into the reasons for the mistrial, is where the defendant sought or consented to the mistrial. *United States v. Jorn, supra,* 400 U. S. at 484-485; *Cornish v. State, supra,* 272 Md. at 318-319; *United States v. Beasley,* 479 F. 2d 1124 (5th Cir.), *cert. denied,* 414 U. S. 924, 94 S. Ct. 252, 38 L.Ed.2d 158, *reh. denied,* 414 U. S. 1052, 94 S. Ct. 557, 38 L.Ed.2d 340 (1973); *United States v. Goldstein,* 479 F. 2d 1061, 1066 (2d Cir.), *cert. denied,* 414 U. S. 873, 94 S. Ct. 151, 38 L.Ed.2d 113 (1973). . . ."

In the present case, it is clear that appellant Bartley, through his counsel, "sought or consented to the mistrial". The circumstances surrounding the declaration of the mistrial failed to show any prosecutional or judicial overreaching such as to harass the appellant or to enhance the chances of conviction in a second trial. *See Baker, Whitfield & Wilson v. State,* 15 Md. App. 73, 94 (1972).

Appellant's claim that the jury was discharged without his personal consent is without merit. Unlike the situation in *Jourdan, supra,* where the defendant himself opposed the mistrial although his counsel consented, there is no indication here that appellant opposed the mistrial. The record shows that he discussed the matter with his counsel and the entire colloquy between court and counsel quoted *supra* took place in his presence. Under the circumstances, we hold that appellant Bartley is "deemed to have consented or to be bound by his attorney's action" (*Jourdan v. State, supra,* at 509) and that when he was brought to trial the second time there was no violation of the double jeopardy clause of the Fifth Amendment of the United States Constitution.

## II

*Admissibility of Identification Testimony*

After opening statements by the prosecutor and defense counsel a suppression hearing was held out of the presence of the jury "on the question of possible suppression and exclusion of any extra-judicial identification, and the question of propriety of allowing an in-court identification, if one can be made".

At the conclusion of the hearing the trial judge denied each appellant's motion to exclude evidence of the extra-judicial photographic identifications as well as the in-court identifications expected to be made before the jury by the three victims.

Each of the victims and Lieutenant Skaife of the Montgomery County Police Department gave substantially the same testimony before the jury that they gave at the suppression hearing concerning the pre-trial viewing of photographs. In addition, Andrew Der and Marietta Der made positive in-court identifications of both appellants. Paul Der made a positive in-court identification of Hill, but was unable to identify Bartley.

On appeal, the contentions of each appellant attacking the trial judge's rulings are somewhat different. We consider first the arguments of Hill insofar as they differ from those of Bartley.

### (1)

No photograph of Hill was shown to any of the victims until November 21, 1974, four days before trial no. 1. On that date, Lt. Skaife went to Florida where Andrew Der was attending college and showed him an array of six black and white photographs, one of Hill and one of each of five other black males. Lt. Skaife testified at the suppression hearing that from this array Andrew identified Hill and one Brazwell as being two of the five intruders at the Der home on December 20, 1972. Lt. Skaife characterized the

identifications as "tentative".[3] Andrew, however, characterized his photographic identification of Hill as "positive".

On November 24, 1974, the day before trial no. 1, the Hill array was shown to Paul Der at his home. He made a "tentative" identification of Hill. In a separate viewing of the same array on that date, Marietta Der made a "positive" identification of Hill. On the same date, Andrew Der was shown the Hill array for the second time and again isolated the photographs of Hill and Brazwell, but said, as between the two, that Hill was "the closest one".

Hill does not argue that the makeup of the array containing his photograph was suggestive, and we find no evidence that Lt. Skaife made any improper suggestions that would prompt the witnesses in their identifications. Hill's major argument is that once a suspect is in custody and especially when he has been indicted, photographs should not be used when more reliable identification procedures are feasible. If such photographic procedures are employed during the post-arrest stages, he contends that the burden is placed upon the State to show compelling circumstances to justify the use of such procedures in lieu of a corporeal line-up. If the State fails to meet this burden, then, he argues, his due process rights have been *per se* violated by the use of the less reliable procedure and a reversal is mandated. At the same time, however, Hill recognizes that in *Neil v. Biggers*, 409 U. S. 188, 93 S. Ct. 375 (1975), the Supreme Court declined to impose a strict rule

---

**3.** Lt. Skaife explained his use of the terms "tentative", "tentative — positive" and "positive" in characterizing photographic identification made by witnesses:

"A tentative identification is when a person isolates on a photograph and is just not sure. There is something about the photograph; I guess it's a feeling within the individual and says, you know, there's something about the photograph. But tentative would be something, I'm not sure.

"A tentative to positive is where a person feels, in essence, this looks like the person but I'm just not sure and it has more strength when I hear this type of expression from a witness.

"A positive identification is when they indicate by the photograph that this is the person they identify to be the perpetrator of the crime of which they have been a victim."

barring evidence of suggestive confrontations because a more reliable procedure may be available. He nevertheless argues that *Neil v. Biggers* applies only to those cases tried before *Stovall v. Denno*, 388 U. S. 293, 87 S. Ct. 1967 (1967), where the Supreme Court first gave notice that there was more involved in the suggestiveness of confrontation procedures than a jury question. This latter argument, however, is without merit, for in *Dobson v. State*, 24 Md. App. 644 (1975), this Court, speaking through Judge Gilbert (now Chief Judge), made it clear that, despite the holding to the contrary in *Smith v. Coiner*, 473 F. 2d 877 (4th Cir. 1973), *Biggers* applies to post-*Stovall* cases as well as to pre-*Stovall* cases "insofar as this State is concerned". *Id*. 654.

In *Biggers, supra*, at 196-197, the Court in rejecting "a strict rule barring evidence of unnecessarily suggestive confrontations" reiterated the "governing test" set forth in *Simmons v. United States*, 390 U. S. 377, 384 (1968), where witnesses make in-court identifications arguably stemming from previous exposure to a suggestive photographic array:

> "[W]e hold that each case must be considered on its own facts, and that convictions based on eye-witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly [4] suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

The Court in *Biggers* went on to hold that "unnecessary suggestiveness alone" does not require the exclusion of evidence. *Id.*, at 198. Rather, the "central question" is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive". The Court then said:

> " . . . . As indicated by our cases, the factors to be

---

4. As indicated by the citations in Dobson v. State, *supra*, at 653, the words "unnecessarily" and "impermissibly" when coupled with "suggestive" would appear to have the same meaning — lack of compelling circumstances.

considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

Applying these factors to the present case against Hill, and after our constitutionally mandated independent review of the evidence presented at the suppression hearing, we conclude that although we find no compelling circumstances justifying the exclusive use of photographic identification procedures, especially at such a short time before trial, under the totality of the circumstances the procedures used did not give rise to a very substantial likelihood of misidentification. As said in *Biggers*, at 198, "It is the likelihood of misidentification which violates a defendant's right to due process ... " and forms the basis for the exclusion of evidence.

The intruders were present in the Der home for approximately 20 minutes. During the period all of the Ders had ample opportunity to view their attackers under good lighting conditions. Although the Ders were not shown Hill's photograph until 23 months after the crimes, it cannot be doubted that the circumstances surrounding the events of December 20, 1972, left indelible impressions upon their minds. Such circumstances are unlikely to be soon forgotten.

(2)

Both appellants contend that the in-court identifications made by the victims were "tainted" by an incident that occurred on the morning of trial no. 1, November 25, 1974. Prior to commencement of the trial, as the three Ders were about to enter the courtroom, they saw both appellants standing in the hallway. Subsequently, the appellants entered the courtroom and took seats behind the Ders. Andrew Der testified that he was surprised to see them because he thought they would be in custody. He described

his recognition of them: "Just as soon as I saw them, it flashed back; it was so weird seeing them in person . . . . Their faces. I remember seeing them as I did the night of the crime".

As we understand appellants' contention regarding the incident, it is that the confrontation amounted to an illegal "show-up", aggravated by the fact that only the night before the Ders had been shown a photographic array containing a photograph of Hill that they had identified. The contention is without merit. There is no evidence that the State or the police had anything whatever to do with the confrontation, or that it was anything other than a chance meeting. Moreover, the evidence is clear that Andrew recognized appellants immediately before they were in any way singled out as the persons to be tried that day. See *Layman v. State,* 14 Md. App. 215, 222-223 (1972). Appellants' due process rights were not violated.

(3)

A photographic array containing the picture of appellant Bartley (but not Hill) was shown to Paul and Marietta Der on December 23, 1972, out of the presence of each other. Marietta Der made a tentative identification of Bartley. Paul Der was unable to identify him. The next day, December 24, 1972, the same array was shown Andrew Der, who made a positive identification of Bartley. Also, on December 24, at a separate viewing, Andrew was shown another array of 13 color photographs including those of three individuals who eventually entered guilty pleas with regard to the events of December 20, 1972, at the Der home. Appellants' photographs were not included in that array. Andrew made positive identifications of two of the three (George Bartley and Alfred Truesdale) and a tentative identification of the third (Peter Hackett). He also tentatively identified two others, Jessie Bell and Wesley Wilson.[5]

---

5. The same color array was also shown to Paul and Marietta Der. Paul Der positively identified George Bartley and picked out Wesley Wilson's photograph as a "look-a-like". Marietta Der made a positive identification of George Bartley and Peter Hackett, a "tentative positive" identification of Alfred Truesdale and a tentative identification of Wesley Wilson.

At the suppression hearing, Lt. Skaife testified that the photographs of Jessie Bell and one Addison Walter were missing from the color array because they had been returned to the police files and could not be located for production in court.

Appellants contend on appeal that the absence of the two photographs at trial "tainted the identification process" as they were "unavailable for scrutiny by the defense or the Court". Appellant Bartley contends further that the absence of Jessie Bell's photograph which Andrew Der tentatively identified "deprived him of an opportunity to challenge Andrew Der's identification of the defendant [Bartley] . . . or to challenge his recollection based upon prior mis-identification when Andrew Der testified before the jury".

We think Judge McAuliffe correctly disposed of these contentions at the suppression hearing:

> "The specific questions raised by the defendant's counsel, in addition to that general question, deal first with the missing photographs. That at a prior time in this case, photographs were shown to these witnesses and that one or more of these witnesses picked out on a tentative basis two persons as being possibly among those who were in their home and that the photograph of one of those persons is no longer in the police files or available to these investigating officers.
>
> "It appears from all that we have heard what happened was this. That that photographic array was presented to the witnesses at a time prior to the trial of the first three defendants in this case. It resulted in identification being made in connection with those first three defendants but no identification being made in connection with these two defendants. Accordingly, when the first three defendants all entered pleas of guilty and were found guilty and sentenced, the police returned certain of those photographs, not all of them,

except possibly the first three defendants, to their working files apparently as is their custom.

"This would appear, under the circumstances of this case, to have been an unfortunate judgment. They should have been retained because any array displayed to any witness pertains to all five defendants and not just the three. When it became apparent that the prior array would be considered in connection with these identifications, the police sought to retrieve all of those photographs which they had identified and they knew which they were. When they went back in their files, some had been taken out, more particularly, two had been taken out, apparently for use in other cases and there would be no way of knowing where they were or no way of finding them so we are missing two. One is not of much significance because, although it was in the array, it was never selected by anyone even as a tentative identification. The other one has some significance in that it was at least given a tentative identification and it would be preferable if it was before this jury because of the weight factor.

"Obviously, the extent to which that photograph might be completely different as to facial characteristics from either of these two defendants would be of some importance, although that has to be weighed against the fact that in picking that photograph as a tentative the witness or witnesses may have intended it or may have thought it looked like one of the other three and never thought it looked like these two at all. There would be no way of knowing that, I would think.

"It would have some relevance and some bearing and we would allow it to go before the trier of fact and it would be preferable if it was here, but judging the State's conduct, it is obvious this is no intentional expression [sic] of relevant evidence or destruction of relevant evidence. It is entirely unintentional and in good faith. They don't believe

that an array applied to the earlier case since it was over. There was no need to retain the array. Secondly, the defendants in this case had the benefit of the testimony, at least of such misidentification should they decide to use that. I point out the obvious strategical problems involved in that determination which is one for trial counsel after conference with their defendants. Should they desire to bring to the attention of this [sic] trier of fact the misidentification, then they can show that two photographs were selected by one witness as tentative and they can show one of those photographs and produce evidence of the identify [sic] of the other person and show clearly it is not one of the original three nor one of the two on trial and produce before the jury testimony that that photograph has been misplaced or is no longer available to the police.

"The Court doesn't feel that that unfortunate loss of one photograph is of such magnitude under all of the circumstances of this case as to justify the extreme sanction of excluding pretrial identification and possibly in-court identification."

As already indicated, the missing photographs were never included in either the Hill array or the Bartley array shown the victims, and neither appellant has challenged the make-up of those arrays. We further observe that neither appellant attempted to place before the jury, as suggested by Judge McAuliffe, any evidence concerning the so-called "misidentifications" made by the Ders of either Jessie Bell or Wesley Wilson. In the circumstances, we find no prejudice amounting to a denial of due process.

## III

### *Trial Court's Denial of Motion for Mistrial Upon Alleged Violation of Sequestration Rule*

On February 11, 1975, after Andrew Der had completed his testimony and Marietta Der was still on the stand, the

trial was recessed for the day. Maryland Rule 753, dealing with sequestration of witnesses, had previously been invoked by the court, and when Mrs. Der left the stand the court admonished her "not [to] discuss any aspects of this case or your testimony . . . ." At that point the Ders went to the prosecutor's office to request additional police protection. While communicating by telephone with a Captain MacDonald concerning arrangements for the additional protection, the prosecutor remarked to him that Andrew Der had already identified the appellants from the witness stand. Bartley's counsel, who was present in the prosecutor's office, reported the matter to the court and both counsel moved for a mistrial or dismissal. The judge conducted a hearing out of the presence of the jury and denied the motions after determining appellants suffered no prejudice from the incident. The judge further found that any violation of the sequestration rule was unintentional. Judge McAuliffe said:

"The Court is satisfied that if they heard it, it didn't register or they did not hear it, that it has not influenced them or had impact upon them and that, in fact, it would appear to me that they are not aware of it. Even if they suspected it, which they may from being very practical, gentlemen, they know Andrew, that he was there. I am sure they knew Andrew's reaction when he saw the defendants in the hall. I doubt that they would have much seriously doubted that Andrew probably is in a position to identify one or both. I am satisfied, however, that they do not know what he testified to and the specifics of what he was asked to do or did do in terms of an in-court identification."

Our review of the record convinces us that the judge did not abuse his discretion in denying the motion and that appellants were not prejudiced by the incident. We see no error in the rulings.

*Judgments affirmed.*