COSTELLO WILLIAM TOBIAS *v.* STATE OF
MARYLAND

[No. 84, September Term, 1977.]

*Decided October 19, 1977.*

The cause was argued before· DAVIDSON, MELVIN and WILNER, JJ.

*William F. Edwards, Assigned Public Defender,* with whom was *Carl W. Greifzu* on the brief, for appellant.

*Bruce C. Spizler, Assistant Attorney General,* with whom were· *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Robert C. Bonsib, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

The appellant, Costello William Tobias, and a co-defendant, Michael Robinson, were charged in a multi-count indictment with rape, robbery with a deadly weapon, breaking and entering, larceny, carrying a dangerous weapon, and a variety of other related crimes, all arising out of incidents alleged to have occurred on March 5, 1976.

After a series of preliminary proceedings, some of which are discussed below, Michael Robinson elected to plead

guilty to one count of rape and to testify against appellant. Mr. Tobias was tried before a jury in the Circuit Court for Prince George's County, and was convicted of rape, robbery with a deadly weapon, grand larceny, and carrying a dangerous weapon. He was thereupon sentenced to imprisonment for 25 years for rape, ten years for robbery with a deadly weapon, to run consecutively to the 25-year sentence, and five years for larceny, to run concurrently with the ten-year sentence. No sentence was imposed upon the conviction for carrying a dangerous weapon.

In this appeal, the appellant raises two questions:

(1) Was it reversible error for the trial court to deny appellant's motion to dismiss the indictment when the State suppressed the exculpatory photograph picked out by the prosecutrix on the day of the offense; and

(2) Was it reversible error for the trial court to admit into evidence the video tapes of the police fencing operation and allow the State to stop the tapes and make commentary on what the jury was allegedly seeing?

At about 1:00 p.m. on March 5, 1976, Mrs. Kathleen Pitts, then eight months pregnant, was at her mother's home. She was alone and had been sleeping, when she heard a knocking on the door. Although her first reaction was not to answer, the knocking was loud and persistent, and she eventually opened the door. Standing there was "a short black guy", who appeared to be confused, and asked directions to an "unemployment center". He finally asked permission to use the telephone, which Mrs. Pitts refused with the unfortunate comment that she was pregnant and alone. She asked the man to leave, and was about to shut the door, when the man pulled a knife and backed her into the hallway and up the steps. At this point, another man entered the house wearing a yellow plastic "construction" hat. This second man was described by Mrs. Pitts as taller and heavier than the first.

The two men put on what appeared to Mrs. Pitts to be white surgical gloves, then took her upstairs to her parents' bedroom and tied her hands and feet. With one of them alternately guarding her, the two men proceeded to search through the house. After twice appearing to leave and then returning, the short man took Mrs. Pitts into the bathroom, tied her to the towel rack, and raped her. Following this attack, the tall one appeared with a butcher knife, cut off her clothes with it, required her to perform fellatio, then took her into the bedroom and raped her. She was then returned to the bathroom and retied to the towel rack.

Mrs. Pitts testified that, as the two men left the house, she observed that they took with them a diaper bag "full of things they had taken from my parent's room" and a movie projector. At trial, Mrs. Pitts identified a diaper bag, two cameras, a light meter, a flash attachment, and a movie projector, which were ultimately admitted as State's exhibits. The cameras, light meter, and flash attachment Mrs. Pitts stated had been in a picnic basket in her parents' bedroom and were carried away, along with the movie projector, by the two men.

Upon being recalled to the stand, Mrs. Pitts identified the appellant as the "short man".

Phyllis Thomas, Mrs. Pitts' mother, followed her daughter to the stand and identified the cameras, light meter, flash attachment, and projector as belonging to her or her husband and having been taken from her home on March 5, 1976.

Charles Battle, a detective with the Metropolitan (D.C.) Police Department, then testified about a combined law enforcement operation known as Sting II, or "Gotcha Again". This was an undercover "fencing" operation conducted in an old warehouse in the District of Columbia, the function of which was to buy stolen merchandise in order to attract, and ultimately arrest, the thief, and then return the property to its rightful owner.

Detective Battle stated that his role in this operation was to serve as the "counter man" — i.e., the person who initially

inspected merchandise brought to the warehouse, negotiated price with the "seller", and finally made the purchase. Upon making a purchase, Battle would place his initials on the property and then turn it over to another officer. Battle stated that all transactions were video taped and recorded, and he brought with him, under subpoena, a tape that he said fairly and accurately represented a transaction he had with appellant and Robinson between 2:06 and 2:24 p.m. on March 5, 1976.

The video tape, with synchronized audio, was then played on a television screen before the jury. During the running of the tape, Detective Battle, upon questioning by the State's Attorney, described and commented on certain aspects of what was being shown. The relevant part of this colloquy was as follows:

"Q Detective Battle, who are the two individuals indicated in the TV screen right now?

"A Here is myself, and the gentleman here is Mr. Costello Tobias.

"Q Do you see him here in court?

"A Yes, sir.

"Q Point to him, please.

"A (Indicating). This gentleman here.

"MR. BONSIB: Indicating the defendant as one of the individuals in the picture."

After running a while longer, without further comment, the tape was stopped at the State's Attorney's request, and this conversation occurred:

"Q Over to the right there, there is what appears to be a calendar and a clock. Would you tell the jury what the function of that is?

"A The calendar and the clock is to have the day you come in to work, you change the dates. That is the calendar, and the calendar — camera is right behind my right shoulder, and each and every incident would come up on the screen would be the

610

calendar date would be on it and the date and time. Also down here it has the location which is Location Number 2, which indicates that it is Operation Number 2, Incident Number which is 2196, and myself as the actor, Officer C. C. Battle.

"Q That calendar indicates March 5th is the date of this?

"A Yes, sir, that is correct.

"Q And the time according to his clock?

"A Approximately 1409 or 10 at this time."

The viewing of the tape then resumed, but was, for a second time, halted at the State's request, at which point, the record reveals:

"Q The other individual behind the diaper bag, who is that individual there?

"A That is Mike the record player, sir. That is the name he gave me the first time. Mike the record player.

"Q Do you know what his full name is now? Do you recall?

"A Not offhand. I can refer back to my notes.

"Q Would you do that, please?

"A Michael Robinson, sir."

The tape rolled again, but was again stopped and punctuated by the following:

"Q Detective, did you see what Michael Robinson, the individual identified as Michael Robinson, put up on the counter at that point? Did it appear to be what?

"I am sorry, that's Tobias that put it up there.

"A Some type of a hat or bowl of something.

"Q Do you recall what color it was, or hard or soft substance or plastic, metal, do you recall?

"A Not really, I don't. I couldn't say."

The tape was then played to completion, following which Detective Battle identified Mrs. Pitts' diaper bag as "the bag that some of the property was brought into the hole by the two subjects that came in on the film you just saw." He then proceeded to identify the two cameras, attachments, and projector as having been brought in by Tobias and Robinson and purchased from them by Battle.

The State then placed in the record, at the bench and outside the hearing of the jury, the following general description of what the tape showed:

> ". . . what the jury observed on that video tape was a video tape showing Detective Battle on one side of the counter in the District of Columbia, as testified to by him, and that during the course of playing that tape the individual identified as the defendant [Tobias] walked in, followed a short time later by another individual identified as Michael Robinson, and that during the course of the playing of that tape the property which was identified by the detective was handed over to him and a sum of money was paid for those items. That would essentially be the substance of the tape that we saw and I think the record should so reflect."

## I.

### Admissibility of the Video Tape

Appellant's second contention, which we shall deal with first, is that the court erred in admitting the video tape into evidence and allowing the State to interrupt the viewing of the tape with commentary. He complains that:

(1) He was unable to "interrogate the tapes", and thus, although Detective Battle was in court and subject to questioning, "the scope of direct examination as to the alleged purchases was limited because the tapes were used to show how the alleged sales were made", thereby also limiting the scope of his cross examination.

(2) Use of the tape was prejudicial to his defense because

(i) of the notoriety of the "Sting" operation, and (ii) it showed appellant in possession of recently stolen goods, from which the jury might infer that he was guilty of rape as well as larceny; and

(3) The interruptions and commentary interfered with the jury's function of deciding the issue of identification.

We note that appellant has made no claim, either here or below, that admission of the video tape violated his right against unreasonable searches and seizures under the Fourth Amendment, or his right to be confronted with witnesses against him under the Sixth Amendment; nor has he claimed, here or below, that a proper foundation for admission of the video tape was not laid or that the video tape was not an accurate representation of what it portrayed. The grounds for his objection are only those enumerated above. When, in fact, presenting his objection to the tape, in the form of a pretrial motion to suppress, his counsel admitted that the objection was not on Constitutional or technical grounds, but instead "goes to the question of relevance of the evidence versus materiality of it and prejudice that may come out."

Although tape recordings of conversations,[1] spectrographic analyses,[2] and testimony based upon closed circuit television [3] have been held admissible in criminal cases in Maryland, at the time this appeal was filed and argued neither the Court of Appeals nor this Court had yet ruled upon the admissibility of video tapes in such cases. Since then, this Court decided *Colbert v. State*, 37 Md. App. 383, in which we held that a video tape of a confession was admissible as evidence.

*Colbert* necessarily answered the threshold question of admissibility *vel non* of a video tape as a form of evidence, but, as noted, it did so in the particular context of a confession. The nature of, and objections to, the video tape in

---

1. Raimondi v. State, 265 Md. 229 (1972), *cert. den.* 409 U. S. 948 (1972).
· 2. Reed v. State, 35 Md. App. 472 (1977), *cert. granted* 6/29/77.
3. Avery v. State, 15 Md. App. 520 (1972), *appeal dismissed,* 410 U. S. 977 (1973).

this case were somewhat different than in *Colbert;* and, to answer these objections, we shall review, in a somewhat broader context, why and under what conditions, a video tape is a proper and admissible form of evidence.

We first should define what it is we are dealing with. At least two courts have considered a video tape to be nothing more than the combination of a tape recording and a motion picture; [4] but while that may be the observer's sensory perceptions, it is not quite accurate from a technical point of view. According to an Annotation found in 60 A.L.R.3d 333, 335 (Criminal Prosecution — Videotape Film),

> "Videotape recording differs from the ordinary methods of recording images in permanent form in that the image is recorded electronically rather than photographically. Instead of relying on light rays to convey an invisible image, which is then revealed through a chemical process as does standard photography, videotape employs a process whereby the image is sensed by the camera and changed into electrical impulses which can be recorded on the tape." [5]

The effect of this different technique is described by Scott as follows:

> "Video tape recordings really are motion pictures made by recording both sight and sound electronically on magnetic tape. When made in this way there are no visible pictures and no audible sound until the tape is played back. Therefore, unlike an ordinary motion picture film, the video tape bearing invisible electronic impulses cannot be said to be a series of still pictures." [6]

Video tape recording is a relatively recent innovation, dating perhaps from the 1950's. It has, of course, been used

---

4. State v. Lusk, 452 S.W.2d 219 (Mo. 1970); People v. Heading, 39 Mich. App. 126, 197 N.W.2d 325 (1972).

5. *See also* 1 Scott, *Photographic Evidence* § 87 (2d ed. 1969); 3 *id.* § 1294.

6. 3 *id.* § 1294.

rather extensively in the television industry as well as for photocopying. With respect to its use in court proceedings, Scott states:

"Since 1969 a number of decisions have considered the admissibility of video tape recordings, meaning of course the tapes as played back to the trier of fact in the form of a screen image with accompanying sound. These cases fully justify the following statement: Duly verified sound motion pictures of relevant subjects in the form of video tape recordings are admissible in evidence on the same basis as sound motion picture films and subject to the same rules applicable to photographic evidence generally." [7]

The cases do, in fact, support that conclusion. Video tapes depicting confessions,[8] lineups,[9] the scene of a public disturbance,[10] a trail of blood leading from the scene of a crime,[11] the influence of intoxicating liquor [12] have all been held admissible against a variety of objections upon the same basis as photographs. In *State v. Newman*, 484 P. 2d 473 (Wash. 1971), the court stated simply, "The requirements for the admission of video-tapes should be similar to those for photographs." Likewise, *State v. Thurman*, 498 P. 2d 697 (N.M. 1972):

"For authentication of still photographs, the required foundation is that the pictures fairly and accurately represent that which is shown by the pictures. . . . The same rule is applicable to the authentication of a video tape picture."

---

7. 3 *id.* § 1294 (Supp. 1974).

8. Colbert v. State, *supra*; Hendricks v. Swenson, 456 F. 2d 503 (8th Cir. 1972); Williams v. State, 542 P. 2d 554 (Okl. 1975), vacated as to death sentence only, 428 U. S. 907 (1976); State v. Hunt, 193 N.W.2d 858 (Wis. 1972); Paramore v. State, 229 So. 2d 855 (Fla. 1969), vacated as to death sentence only, 408 U. S. 935 (1972).

9. People v. Heading, 197 N.W.2d 325 (Mich. 1972); State v. Newman, 484 P. 2d 473 (Wash. 1971).

10. People v. Mines, 270 N.E.2d 265 (Ill. 1971).

11. State v. Thurman, 498 P. 2d 697 (N.M. 1972).

12. People v. Ardella, 276 N.E.2d 302 (Ill. 1971).

Also *Hendricks v. Swenson,* 456 F. 2d 503 (8th Cir. 1972), cited and followed in *Williams v. State,* 542 P. 2d 554 (Okl. 1975).

We find both the weight of this authority, as well as the reasoning behind it, to be persuasive, and therefore adopt the conditional rule of admissibility set forth in the cases and treatise cited above: duly verified sound motion pictures of relevant subjects in the form of video tape recordings are admissible in evidence on the same basis as sound motion picture films and subject to the same rules applicable to photographic evidence generally.

The rule in Maryland with respect to photographic evidence was set forth in *Carroll v. State,* 11 Md. App. 412, 414 (1971), *cert. den.* 262 Md. 745 (1971), as follows:

"The general rule is that the admission of photographs which are a correct representation of the person, place or object which they purport to represent at the time when the appearance of such person, place or object is relevant to the inquiry in connection with which the photographs are offered is a determination resting within the sound discretion of the trial court (citations omitted). So whether or not they are inflammatory, whether or not they illustrate and explain relevant matters, whether or not they are of any practical value, and *whether or not they are improperly prejudicial* are within the exercise of the court's discretion." (emphasis supplied).

This rule, which in *Carroll* dealt with still photographs, was applied by this Court to motion picture films as well in *Bremer v. State,* 18 Md. App. 291 (1973), *cert. den.* 415 U. S. 930 (1974).

Applying these principals to the case before us, we find no abuse of discretion, and therefore no reversible error, on the part of the trial court in admitting the video tape into evidence. Appellant was charged with larceny and receiving stolen goods, in addition to the sex offenses; and the video

tape of what occurred at the warehouse, where he attempted to dispose of property previously identified as having been stolen from the home of Mrs. Thomas, was clearly relevant and material to those charges. Since his mere possession of recently stolen goods, in the absence of some satisfactory explanation, would permit the inference that he was the thief,[13] thereby placing him in Mrs. Thomas' home, the video tape was relevant and material to the rape charge as well.

Appellant's claim that admission of the video tape restricted his right of cross-examination is without merit. Documentary evidence, such as photographs, often supplants the need to examine witnesses extensively. Moreover, in this case, the record does not disclose any attempted questioning of Detective Battle on cross-examination that was objected to on the grounds that it transcended areas covered on direct examination.

No doubt the video tape was prejudicial to appellant's defense, as he claims; but we find nothing in the record to indicate that it was improperly so. At appellant's request, the prospective jurors were asked on *voir dire*, whether and what they had heard about Operation Sting or "Gotcha Again", and what their opinion was as to its efficiency. Through his ability to challenge prospective jurors for cause and his twenty peremptory challenges, appellant had an ample opportunity to assure himself of a jury that was not improperly impressed with the validity and effectiveness of that operation.

Neither do we find merit in appellant's complaint about the interruption of the video tape and Detective Battle's explanations as to what it portrayed. Trial courts have, and may exercise, the widest discretion in the conduct of a trial, and that discretion may not be disturbed unless it is clearly abused. *Avery v. State,* 15 Md. App. 520, 550 (1972), *app. dism.* 410 U. S. 977 (1973); *Gardner v. State,* 8 Md. App. 694, 699 (1970), *cert. den.* 258 Md. 727 (1970). We find no abuse of discretion in allowing the authenticating witness to identify

---

13. Mercer v. State, 6 Md. App. 370 (1969), *cert. den.* 255 Md. 743 (1969); English v. State, 8 Md. App. 330 (1969).

the people shown in the video tape, or to explain the purpose of the calendar and the clock. The jury saw the tape, and could judge for itself what it showed and whether Detective Battle's identifications were accurate.

## II.

### Suppression of a Photograph

Appellant's first, and more serious, complaint is that the State "suppressed" exculpatory evidence, in the form of a photograph, thus bringing the case within the ambit of *Brady v. Maryland*, 373 U. S. 83 (1963), and some of its progeny and requiring a reversal of his conviction. This contention is based upon the following circumstances.

On the evening of March 5, several hours after the attack upon her, Mrs. Pitts was taken by Detective Carol Landrum to the Sexual Assault Center at Prince George's County Hospital. Detective Landrum stated that, at that center, there was a file cabinet containing two drawers of photographs of known sex offenders. As Mrs. Pitts indicated that her assailants were black males, Detective Landrum got out the drawer containing the photographs of known sex offenders who were black males.

Mrs. Pitts looked through these photographs, and, according to Detective Landrum, picked out two pictures of people that "looked similar to the men who had attacked her." One of these was a polaroid photograph depicting a man's profile. It was not a normal "mug shot" with an identification number, and did not show the subject's full face. This particular photograph was identified only by the name "Charles Williams".

Detective Landrum stated that Mrs. Pitts picked this out and said that the profile of the man in the picture "looked similar to that of one of the men who had attacked her." Mrs. Pitts had stated that one of the men was tall and one was short; and the photograph of Charles Williams "looked similar" to the short one. The other photograph that she picked out resembled the tall man.

Detective Landrum took both photographs to the records

division and attempted to locate more information on this Charles Williams. She discovered that between eighteen and twenty people by that name had been arrested in Prince George's County; but, after checking the "mug shots" and identification numbers of each of them, found that none matched the polaroid snapshot picked out by Mrs. Pitts. Detective Landrum stated that the snapshot "looked quite old", probably dating from the 1950's or early 1960's and depicted a person between eighteen and twenty years old.

On March 30, 1976, nearly three weeks after Mrs. Pitts selected the two photographs, appellant and Robinson were arrested, apparently as the result of an unrelated incident. The next day, Detective Gale went to Mrs. Pitts' home, and showed her another array of photographs, containing pictures of both appellant and Robinson. Mrs. Pitts testified that she "picked out the picture of the taller one and was positive about that. I also picked out a picture of the shorter — a picture that resembled the shorter one." Detective Gale did not testify; and, although the record seems clear that the photograph of the taller person, of which Mrs. Pitts was positive, was that of Robinson, it is not clear whether the photograph of the shorter person, of which she was not positive, was that of appellant.[14]

---

14. Appellant states, in his brief, that Mrs. Pitts picked out the picture of Robinson as being the taller man, but she did not pick out the picture of appellant. The State, in its brief, asserts that she "positively selected the photograph of [Robinson] as being the taller man, and, in addition, selected the photograph of the appellant as 'resembling' the shorter assailant."

John McGroarty, an investigator for the public defender's office, stated that he had interviewed Mrs. Pitts at her home on July 28, 1976, and that Mrs. Pitts had told him at that time that she had identified the taller person but had not identified the shorter one, either by photo or in person. Mrs. Pitts, in answer to the question of when she "first saw or identified a picture of Mr. — or the shorter individual", testified that it was "when Detective Gale brought the photos to my house in Silver Spring, when I picked out the picture of the taller one and was positive about that, I also picked out a picture of the shorter — a picture that resembled the shorter one." She stated that she signed the picture of which she was positive, but was not asked to sign the other. Later, she testified as follows:

"Q When was the last time you saw him or saw a picture of the defendant?
"A Are you talking about the shorter one?
"Q Yes.
"A March 31.

With the arrest of Robinson and appellant, and upon the assumption that Robinson had been positively identified and appellant had been "tentatively" identified, Detective Landrum saw no further need for the two pictures taken from the Sexual Assault Center; and she therefore returned them to the file there on or about March 31. This, she said, was normal police procedure: once an arrest is made, "you return all other pictures of people who were involved or possibly involved in the case."

The file cabinet, according to Detective Landrum, had a combination lock on it, but the combination was written on the side of the cabinet. Thus, in her words, "any police officer who cared to take anybody up there to view these files had access to them, because they could open the cabinet and show the victim or the witness, whoever, the pictures."

Approximately three months later, in response to appellant's motion for discovery, Detective Landrum returned to the file at the Sexual Assault Center to locate the two photographs, but found that they were missing. She then checked with all members of the Prince George's

---

"Q And this was when you did not make a positive identification?
"A That's right.
"Q Now, do you know whether or not the short defendant's picture, or Mr. Costello Tobias' picture was in that spread that was shown to you on the 31st?
"A Do I know that now?
"Q Yes.
"A Yes."

The only other evidence on this point in the record was the statement of Detective Landrum, who, in explaining her return of the initial photographs picked out by Mrs. Pitts at the hospital, stated, "Once the two accused had been arrested and positively and tentatively identified I saw no further need for these two pictures." For whatever value it may have, on the morning of trial, in arguing a renewed motion to dismiss the indictments, the State's Attorney stated to the Court:

"Eventually two suspects were arrested in the rape. At that point a photographic spread was shown to the victim, she positively identified the defendant Robinson as one of the individuals who raped her, *and she tentatively identified Costello Tobias*, and it was a tentative identification, there is no question about it." (emphasis supplied).

Although defense counsel offered a rebuttal to the State's argument, he did not challenge that statement.

County Police Sex Squad, the Greenbelt Police, the University of Maryland Police, the Maryland State Police, the U.S. Park Police, the State Park Police, and the Cheverly Police in an attempt to locate the two photographs, all to no avail. She returned to the Sexual Assault Center files each week for four consecutive weeks; but that too was in vain, as were additional efforts by the State's Attorney's Office. At some point prior to trial, the photograph of the taller man was located and produced, but the picture of the shorter man never was found.

On these facts, appellant filed a pre-trial motion to dismiss the indictments against him. An evidentiary hearing was held, at which Detective Landrum was the only witness; and the motion was denied on the ground that, at the stage of the case, there was not enough evidence from which the court could determine whether the loss of the two photographs [15] was of such magnitude under all the circumstances to justify granting it. In effect, the court stated that granting the motion then would be premature, but that this decision was without prejudice to a later motion "should the evidence show that [appellant] is denied due process because of the loss of the material evidence." The motion was renewed at trial, and was again denied.

Appellant's argument was, and is, that, in light of Mrs. Pitts' inability positively to identify the appellant from the spread of photographs shown to her on March 31 (or, if appellant's premise is accepted, her failure to identify him at all), and the obvious importance of the identification issue, the missing photograph of "Charles Williams" was critical to the defense. Absent that photograph, he claims, the jury was not afforded the opportunity to evaluate whether the person depicted in it had the physical characteristics of appellant.

Mrs. Pitts, as noted, did make a positive identification of appellant in the courtroom. Thus, the function of the missing photograph could only have been to impeach the credibility of that identification, and, if we assume that it

---

15. At that point, the photograph of the taller man had not yet been located.

was, in fact, appellant's picture that she tentatively identified on March 31, the credibility of that identification as well.

With this background, we now examine appellant's "Brady" argument.

Long before *Brady v. Maryland*, it had been generally recognized that the suppression or withholding by the State of material evidence exculpatory to an accused may be a violation of due process. This is evident from both the Opinion of the Maryland Court of Appeals and that of the Supreme Court in the *Brady* case itself.[16]

The facts in *Brady* were as follows. Two co-defendants, Brady and Boblit, were charged with the felony murder of one Brooks, the homicide occurring during the course of a robbery. The defendants were tried separately, Brady being tried first. It was conceded that both defendants had conspired to rob the victim, and that they had each actually participated in the robbery. One of them had strangled the victim to death (hence the murder charge); and the issue arose as to which of them performed that act. Boblit had made several confessions, in all but one of which he claimed that Brady had strangled Brooks. In one confession, which was unsigned, he admitted strangling Brooks himself. Those of Boblit's confessions charging Brady with the actual murder were made available to Brady's counsel prior to Brady's trial; but the one which exculpated Brady from the killing was neither disclosed pre-trial nor offered at trial.

The State knew that Brady's only real hope was that the jury might believe his testimony that Boblit had done the actual killing, and thus find him guilty of first degree murder *without* capital punishment. Obviously, the withheld statement of Boblit was highly relevant in that context, and the Court of Appeals concluded that its withholding was prejudicial to Brady. Since, in the Court's view admission of this confession would have been entirely irrelevant as to Brady's guilt and could only have affected

---

16. The Opinion of the Maryland Court of Appeals is found at 226 Md. 422, 427 (1961). *See* in particular, Mooney v. Holohan, 294 U. S. 103 (1935).

his punishment, the Court remanded the case for a new trial on the question of punishment alone.

Reviewing the matter on *certiorari*, the Supreme Court agreed with the Court of Appeals both as to its statement of the Constitutional principle and as to its actual holding. The statement for which *Brady* is most noted appears at 373 U. S. at 87:

> "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

This statement, not unlike many emanating from the Supreme Court, has produced considerable discussion in literally hundreds of cases throughout the country, as well as in the law journals and legal literature generally. Many of these cases and literary sources are collected in an Annotation appearing in 34 A.L.R.3d 16 (1970).

Two years after *Brady*, the Court of Appeals, in *State v. Giles*, 239 Md. 458, 469 (1965), considered the *Brady* principle in these terms at 469:

> "While we agree that evidence which is claimed to have been suppressed must be reasonably considered to be admissible and useful before suppression may be said to exist, this is not the sole test in determining when a suppression of evidence can be said to amount to a denial of due process. Not only must the evidence withheld be admissible and useful, but it must be such, if it had been offered in evidence, as would be capable of clearing or tending to clear the accused of guilt — *i.e.*, it must be exculpatory.

Refining this further, the Court stated, also at page 469:

> "We think that in order for the nondisclosure of evidence to amount to a denial of due process it must be such as is material and capable of clearing

or tending to clear the accused of guilt or of substantially affecting the punishment to be imposed in addition to being such as could reasonably be considered admissible and useful to the defense."

Significantly, the Court went on to hold that:

". . . in a situation involving passive nondisclosure an inquiry must be made into the question of whether the nondisclosure may have operated to the prejudice of the accused. Certainly there should be no duty on the prosecution to disclose evidence that is available to the accused or lacking in probative value, or, in some circumstances, evidence that is merely circumstantial."

Thus, although obviously interrelated, the Court appeared to fashion two somewhat separate requirements that must be met before passive suppression of evidence will constitute a denial of due process; one being the "pure" materiality of the evidence, and the second being that its suppression has operated to prejudice the accused.

The Supreme Court granted *certiorari* in this case also, pointing out that it presented the broad questions "whether the prosecution's constitutional duty to disclose extends to all evidence admissible and useful to the defense, and the degree of prejudice which must be shown to make necessary a new trial." 386 U. S. 66, 74 (1967). The Court declined to address those issues, however, and therefore did not comment upon the test laid down by the Court of Appeals. Instead, it remanded the case to the Court of Appeals for further proceedings in the light of evidence that had been presented to it that was not part of the record and that, accordingly, had never been considered by either the trial court or the Court of Appeals.

Some refinement of *Brady*, or, more appropriately, a coalescence of *Brady* with its precursors,[17] by the Supreme

---

17. Mooney v. Holohan, 294 U. S. 103 (1935); Pyle v. Kansas, 317 U. S. 213 (1942); Napue v. Illinois, 360 U. S. 264 (1959).

Court occurred in *Giglio v. United States,* 405 U. S. 150 (1972). In that case, the prosecution had failed to disclose an alleged promise made to its key witness that he would not himself be prosecuted if he testified for the Government. This failure was not deliberate, but was occasioned by the fact that the assistant United States Attorney who prosecuted the defendant was unaware that any such promise had been made. In reversing the conviction, the Court stated (with citations omitted) at page 153:

> "Thereafter *Brady v. Maryland,* 373 U. S. at 87, held that suppression of material evidence justifies a new trial 'irrespective of the good faith or bad faith of the prosecution.' ... When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule. ... We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. ...' A finding of materiality of the evidence is required under *Brady.* ... A new trial is required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury. ...' "

Significantly, we think, the Court went on to point out that the Government's case "depended almost entirely" on the testimony of the particular witness, and that "without it there could have been no indictment and no evidence to carry the case to the jury." 405 U. S. 154. Thus, the Court considered the fact that this witness was testifying under what was equivalent to a promise of immunity as one which, in a reasonable likelihood, could have affected the judgment of the jury.

The Supreme Court had another occasion to consider what we may now term the *Brady* principle in *Moore v. Illinois,* 408 U. S. 786 (1972), *reh. den.* 409 U. S. 897 (1972). Moore was convicted of murdering the owner of a bar in Lansing,

Illinois, a village near Chicago. Two eyewitnesses positively identified him, in court, as the killer. Another State witness, Sanders, testified that two days after the murder, he was told by a person whom he knew as "Slick" that it was "open season on bartenders", and that he (Slick) had shot one in Lansing. At trial, Sanders identified Moore as "Slick".

Prior to trial, the defense had moved for disclosure of "all written statements taken by the police from any witness." Sanders had given a statement to the police that he had met "Slick" for the first time about six months earlier at a certain bar. At that time, Moore was in jail, and could not have been in that bar. This statement was not given to defense counsel. After Moore's arrest, he was photographed, and the photograph was shown to a patron of the bar where the alleged conversation between Sanders and "Slick" took place. This witness stated that the photograph did not resemble the person he knew as "Slick", but he did identify a photograph of someone else as being "the Slick I know." This too was not disclosed. Finally, in terms of relevance here, Sanders, at the start of the trial, observed Moore for the first time, and remarked to the prosecutor and several police officers that the person he knew as "Slick" was 30-40 pounds heavier than Moore and did not wear glasses. Defense counsel was not made aware of that remark.

On these facts, the Court held that there was no violation of *Brady*. In so doing, it stated, at page 794:

> "The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence. These are the standards by which the prosecution's conduct in the Moore case is to be measured."

Applying these standards, the Court noted, at page 795, that:

"[W]e know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. Here, the elusive 'Slick' was an early lead the police abandoned when eyewitnesses to the killing and witnesses to Moore's presence at the Ponderosa were found."

All of the "suppressed" evidence, the Court said, related to "Slick", rather than Moore, and did not serve to impeach the other identifications of him. Thus, the Court concluded, "in light of all the evidence, that Sanders' misidentification of Moore as Slick was not material to the issue of guilt." 408 U. S. 797. It was, the Court held, "at most an insignificant factor." p. 798.

Taking the broad statement in *Brady* as refined by the tri-partite standard stated in *Moore*, it is evident that, despite the lack of wilfullness and acknowledging the heroic and good faith efforts on the part of the State to recover the missing photograph, it was, in fact, "suppressed" within the meaning of *Brady*. Suppression may occur even if the evidence is lost or misplaced through negligence. Deliberate concealment is not required; for, as both *Brady* and *Giglio* point out, the prosecution's good or bad faith is irrelevant. *See People v. Harmes*, 560 P. 2d 470 (Col. 1976); *Trimble v. State*, 402 P. 2d 162 (N.M. 1965); *United States v. Consolidated Laundries Corporation*, 291 F. 2d 563 (2nd Cir. 1961); *United States v. Bryant*, 439 F. 2d 642 (D.C. Cir. 1971). Neither may the State escape responsibility on the theory that the negligence, if that is what it was, from which the "suppression" arose, was that of the police rather than the prosecutors. *Barbee v. Warden, Maryland Penitentiary*, 331 F. 2d 842 (4th Cir. 1964); *State v. Giles*, 239 Md. 458, 245 Md. 342; *Ross v. Warden, Maryland Penitentiary*, 1 Md. App. 46 (1967); *City of Seattle v. Fettig*, 519 P. 2d 1002 (Wash. 1974).

Additionally, we may accept appellant's contention that the evidence in question was of a favorable character to the

defense. The decisive question is whether, and to what extent, the missing photograph was "material".

Woven into the concept of materiality, as noted above, are the two considerations first stated by the Court of Appeals in *Giles*, left untouched by the Supreme Court on review of that case, and implicitly, if not explicitly,. applied by the Supreme Court in *Moore*; namely:

> (1) was the evidence capable of clearing or tending to clear the accused of guilt or of substantially affecting his punishment; and
>
> (2) where, as here, the nondisclosure was passive, did its suppression operate to appellant's prejudice?

As both this Court and others have made clear, where the suppression was not deliberate the second area of inquiry is not to be ignored merely because the first appears, on its face, to be satisfied.[18] Instead, there is a balancing process that must occur through which the answer to the first question may be influenced, if not controlled, by the answer to the second. Unfortunately, a clear and uniform rule as to how this balancing process should proceed has not emerged from the cases decided to date. Some expression of the confusion and overlapping of concepts is found in the following footnote in *Evans v. Janing*, 489 F. 2d 470 (8th Cir. 1973) at 477:

> "The standard of materiality has varied greatly. Where the nondisclosed evidence is patently immaterial, it has been held outside the reach of *Brady* as in Peterson v. United States, 411 F. 2d 1074 (8th Cir.), cert. denied, 396 U. S. 920, 90 S.Ct. 247, 24 L.Ed.2d 199 (1969), or else the harmless error standard has been applied. United States v. Davila-Nater, 474 F.2d 270 (5th Cir. 1973). Levin v. Clark, 133 U.S.App.D.C. 6, 408 F.2d 1209, 1212

---

**18.** *See also* Powell v. State, 16 Md. App. 685 (1973), and Bartley and Hill v. State, 32 Md. App. 283 (1976), where the defendants' suppression claim was decided adversely to them solely on the basis of lack of prejudice.

(1967) stated the test in terms of 'whether the evidence might have led the jury to entertain a reasonable doubt' about defendant's guilt. Perhaps the most realistic standard is simply whether the nondisclosure prejudiced the defense. Simos v. Gray, 356 F.Supp. 265 (E.D.Wis.1973); *cf.* United States v. Brumley, 466 F.2d 911 (10th Cir. 1972), cert. denied, 412 U.S. 929, 93 S.Ct. 2755, 37 L.Ed.2d 156 (1973); Kyle v. United States, 297 F.2d 507, (2d Cir. 1961), cert. denied, 377 U.S. 909, 84 S.Ct. 1170, 12 L.Ed.2d 179 (1964). *See* Comment, 40 U.Chi.L.Rev. 112 (1972)."

In an attempt to bring some semblance of order and clarity from all of this, we start with the underlying proposition, founded upon the language used by the Court of Appeals in *Giles* that, to be material, the evidence must be admissible, useful to the defense, and capable of clearing or tending to clear the accused of guilt or of substantially affecting his possible punishment.

When one examines the cases in which convictions were sustained on the basis that the suppression was nonprejudicial, one finds that, in reality, the court was holding that, in light of the other inculpatory evidence in the case, the suppressed evidence was not truly capable of clearing, or tending to clear, the defendant of guilt. Thus, although some of those decisions appeared to be grounded on a lack of prejudice, as though that were a separate element with an independent operative effect, a careful reading of them indicates that prejudice, or a lack of it, was viewed more as an inherent consideration in judging whether the suppressed evidence was, in fact, material.

The element of prejudice has arisen and been discussed in at least three contexts, sometimes in combination with each other:

(1) where the defendant failed to make a timely request for the discovery or production of the evidence; [19]

---

[19]. *See* Younie v. State, 19 Md. App. 439, 460 (1973), *revd. on other grounds*, 272 Md. 233 (1974); United States v. Keogh, 391 F. 2d 138 (2nd Cir. 1968).

(2) where the nondisclosure or suppression was "passive" rather than deliberate; [20] and

(3) where the suppressed evidence was relevant solely to impeach the credibility of a prosecution witness and did not go directly to the question of guilt or innocence.

Appellant here did make a timely request for the photograph; and thus, at first glance, it would seem that we are not concerned with the first of these situations. It is important to note, however, that, for all practical purposes, the photograph in question may be deemed to have been "lost", and thus became unavailable, before the request for its production was made. It was missing when Detective Landrum first went to retrieve it in response to appellant's discovery motion. This becomes relevant when combined with the second factor — the passive, rather than deliberate, circumstances under which it was lost.

In *People v. Amison*, 245 N.W.2d 405 (Mich. 1976), the Court held that, "absent intentional suppression or a showing of bad faith, the loss of evidence which occurs before a defense request for it does not mandate reversal." *See also United States v. Augenblick*, 393 U. S. 348 (1969); *Bartley and Hill v. State*, 32 Md. App. 283 (1976). The theory, as expressed in *United States v. Bryant*, 439 F. 2d 642 (D.C. Cir. 1971), is that, although the duty to disclose evidence includes the duty to preserve it in order to permit disclosure, and thus attaches once the evidence is gathered, "criminal convictions otherwise based on sufficient evidence may be permitted to stand so long as the Government made 'earnest efforts' to preserve crucial materials and to find them once a discovery request is made." 439 F. 2d at 651.

What constitutes "earnest efforts" to preserve "crucial materials"? In *People v. Amison, supra,* the Court implied that the standard was satisfied where "carelessness", but not "gross negligence" was involved. We are not prepared to adopt so loose a test; there is a duty not to be careless. In *Bryant,* the loss of a tape recording that may have been

---

**20.** *See* Kyle v. United States, 297 F. 2d 507 (2nd Cir. 1961), *cert. den.* 358 U. S. 937 (1959); United States v. Keogh, 391 F. 2d 138 (2nd Cir. 1968).

directly exculpatory resulted from the deliberate failure on the part of the officer having possession of it to take reasonable steps to preserve it, upon the theory that the tape would not be used as evidence. This, the Court felt, was far more serious than an inadvertent loss, notwithstanding that the decision not to preserve the tape was made in good faith. Yet, even under that circumstance, the Court declined to reverse the conviction, remanding the case, instead, for the District Court to "weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice."

The question, in the end, comes down to whether the State took reasonable precautions to preserve the evidence. At the time, Detective Landrum did not believe that the photographs, given the other evidence against appellant and Robinson, were crucial, or even material. Yet, unlike the situation in *Bryant*, she did take steps to preserve them, albeit not as evidence in this case. She returned them to the file from which they came—a locked file that was accessible to the police for the purpose of identifying sex assailants, but apparently not accessible to the general public. There is nothing in the record to show that she expected any difficulty in being able to retrieve the photographs if the need to do so should arise.

This decision, as it turned out, was wrong, and her expectation unjustified. But, under the circumstances apparent to her at the time, we cannot say it was careless, much less grossly negligent.

We need not, however, base our decision on this premise alone. Of greater significance is the combined existence of the second and third factors — the character of the "suppressed" evidence itself coupled with its passive suppression.

In *Younie v. State, supra*, 19 Md. App. 439, 460, we stated:

"Indeed, when the allegedly suppressed evidence is not evidence which goes directly to the question of guilt but simply to the impeachment of a State's

witness, the broad concensus of legal thinking is that far more will be required to establish materiality." [21]

This statement in *Younie* was based, in part, upon a similar holding in *Link v. United States*,[22] that:

"Evidence material to guilt is, we think, evidence which is of probative character on that question. As to evidence not of that character and having admissibility only for the purpose of impeachment or credibility attack, nondisclosure or suppression, to be violative of due process, would in our opinion, unless the situation is otherwise tainted, have to be of such inherent significance as to represent fundamental unfairness."

A somewhat analogous case in which this principle was applied is *Evans v. Janing*, 489 F. 2d 470 (8th Cir. 1973), an appeal from the denial of habeas corpus relief. The applicant, Evans, had been convicted of robbing a grocery store along with a co-defendant. The only evidence of Evans' participation in the robbery was the positive in-court identification testimony of the owner of the store, Mr. Haffke, and his son, both of whom were present at the scene. At trial, Mr. Haffke was asked about a prior identification of photographs. He replied that the police had shown him an array of photographs, that he had "indicated a color photograph of a man who had a yellow streak down the center of his hair was the same man", but that the yellow streak was not there at the time of the incident.

It later turned out that there was a police report, which surfaced in a subsequent civil proceeding, stating that Mr. Haffke had been shown four colored photos, two of them being of Evans, whose hair had a yellow streak, and that he "could not pick any one from this group of photos." The report then went on to state that Mr. Haffke had identified a

---

**21.** *See also* Green v. State, 25 Md. App. 679, 701 (1975), *cert. den.* 275 Md. 749 (1975).

**22.** 352 F. 2d 207 (8th Cir. 1965), *cert. den.* 383 U. S. 915 (1966).

black and white photograph of Evans. Neither the report, nor apparently the photographs, were disclosed at trial, even though the report stated, "All photos held as evidence." Defense counsel was aware of the fact that Mr. Haffke had identified Evans from photographs.

Certainly, this police report was relevant and "material"; it contradicted the testimony of an eye-witness upon whose in-court identification the conviction was, in large part, based. The Nebraska Supreme Court, on direct appeal, had concluded that there had been no suppression in the first place and that the report was not important enough to warrant a new trial on the basis of newly discovered evidence. *State v. Evans*, 192 N.W.2d 145 (1971).

In the habeas corpus proceeding, the Eighth Circuit Court of Appeals held, that, for purposes of the *Brady* doctrine, the evidence was suppressed, and that it was favorable to the accused, but that it was not sufficiently material to constitute a denial of due process. The Court first noted that the sole purpose for which the report might have been used would be to "impeach the testimony of the key witness." It then quoted from *Link v. United States, supra,* as establishing that "suppressed impeachment evidence requires a higher standard of materiality than would be imposed for evidence directly relevant to guilt." Referring then to the fact that Evans had also been identified by Mr. Haffke's son, the Court concluded, at 489 F. 2d 478:

> "We do not find in this case that 'significant chance' that the police report would induce a reasonable doubt in the jurors' minds; nor do we find, under our own standard, that nondisclosure of the impeachment evidence was of such inherent significance as to represent fundamental unfairness."

One may not assume from any of these cases that impeachment evidence is not fully subject to the *Brady* doctrine, or that its suppression may not result in a denial of due process. Indeed, where such evidence would have so contradicted the testimony of a key witness, or cast such

serious doubt as to his credibility, as to leave the jury with a reasonable doubt of the defendant's guilt, its suppression has served to vitiate a conviction. *See,* for example, *Giglio v. United States, supra; Levin v. Katzenbach,* 363 F. 2d 287 (D.C. Cir. 1966); *Ingram v. Peyton,* 367 F. 2d 933 (4th Cir. 1966).[23]

What is fairly deducible from the cases is that, with respect to impeachment evidence not deliberately suppressed, the court may examine its overall value to the accused in the light of the other evidence properly admitted against him. If, from the record, the court concludes that the suppressed evidence was not of such importance as likely to have changed the result of the proceeding, either by inducing a reasonable doubt as to the defendant's guilt or by serving to convince the body responsible for recommending or imposing sentence that a lesser sentence should be imposed, the suppression will not suffice to require that the result be nullified. Whether the rationale for this is stated in terms of non-materiality, lack of prejudice, or harmless error is not particularly significant; the effect is the same.

In this context, we view the effect of the missing photograph in light of the following circumstances:

(1) In selecting the missing photograph, Mrs. Pitts did not purport to make a positive identification, but stated only that the picture "looked similar" to the shorter of the two men;

(2) The unrebutted testimony of Detective Landrum that the photograph in question appeared to be between eighteen and twenty years old, and was a "profile", rather than a full-face shot; [24]

(3) The jury was read a stipulation that Mrs. Pitts had picked out two pictures from the Sexual Assault Center files that "looked similar" to the men who had attacked her; that "neither of these pictures was the defendant Costello Tobias and that the defendants have requested that the picture that

---

**23.** *See also* Austin v. State, 253 Md. 313 (1969) and Smith v. Warden, 7 Md. App. 579 (1969), which were not decided under Brady.

**24.** *See* State v. Evans, *supra,* 192 N.W.2d 145 (1971).

is alleged to have been similar to Mr. Costello Tobias be produced, that the State cannot produce it, that the picture has been in fact misplaced and is, for all intents and purposes, lost";

(4) Mrs. Pitts' testimony that the men who raped her stole various cameras and attachments from the home, most of which were carried out in her daughter's diaper bag; her identification of most of these items, including the diaper bag; and her positive in-court identification of appellant;

(5) Michael Robinson's admission that he and appellant had entered the home of a white woman in Riverdale on March 5, 1976; that he took a bag from it; and that he and appellant had taken the property in the bag to a warehouse in Washington to sell it; and his identification of Mrs. Pitts' diaper bag as looking like the bag he had taken; and

(6) The testimony of Detective Battle and the video tape of the transaction at the warehouse.

Against this evidence, and in light of the very tentative nature of her "identification" of the missing photograph, we are unable to conclude that the photograph, if available, would have so shaken the reliability of Mrs. Pitts' positive in-court identification or have otherwise cast such doubt upon her credibility as to have induced a reasonable doubt as to appellant's guilt. *See Bartley and Hill v. State, supra,* 32 Md. App. 283. Accordingly, under all of the circumstances present in this case, we do not believe that the photograph was sufficiently material that its unavailability created that magnitude of unfairness in the trial as to have deprived appellant of his liberty without due process of law.

*Judgments affirmed.*
*Appellant to pay the costs.*