# ARVIN QUEEN *v.* STATE OF MARYLAND

[No. 864, September Term, 1974.]

*Decided May 8, 1975.*

The cause was argued before ORTH, C. J., and GILBERT and LOWE, JJ.

*Arthur D. Condon, Assigned Public Defender,* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Warren B. Duckett, State's Attorney for Anne Arundel County* and *James W. Dryden, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Arvin Queen was indicted for escape, convicted in the Circuit Court for Anne Arundel County and sentenced to one year. His conviction rests entirely upon a "base file" which is an institutional record "kept in the regular course of business of every inmate in every institution in the Division of Correction."

The base file in question showed that one Arvin Queen had been convicted of assault on December 24, 1970 and sentenced two months later to serve five years in prison. The file also contained a "Notice of Escape" indicating the "Details Relating to Inmate's Escape:" to be "Walked off from work assignment." That in itself is sufficient to form the corpus delicti of escape, outlined by Judge Menchine in *Robinson v. State,* 18 Md. App. 438, 441-442:

> "§ 139 is a broadly based statute embracing within its purview *all escapes* from lawful confinement, whether the escape was initiated from within or without the walls or other boundaries of a penal facility; whether the confinement was actual or constructive; whether it was effected with or without force, and without regard to the circumstances of confinement if the detention was under color of law."

*Accord, Fabian v. State,* 3 Md. App. 270, *cert. denied* 250 Md. 731.

The State, however, made even better use of that record. Apparently having no one available who could personally identify appellant, the State called upon the record custodian to compare the photograph in the record with the appellant, who had been arrested some two and one-half years after his departure. The State then asked the custodian:

"Using that photo are you able to identify Mr. Arvin Queen? "

To which the custodian replied,

"Yes, I am."

The following colloquy ensued:

"Is he present in the courtroom today?

A   Yes, he is.

MR. LOWMAN: Objection, Your Honor.

A   Sitting at the defense table.

COURT: Well, is this of your personal knowledge you can identify the defendant?

A   I wasn't asked personal. I was to identify him from the picture.

COURT: Is that your objection?

MR. LOWMAN: That's my objection, Your Honor. The witness has no personal knowledge of who Mr. Queen is, and—

COURT: Well if he has a picture of Mr. Queen in the file he can identify him from that. It might be a misidentification but he can identify him."

After that identification appellant questioned the custodian

on cross-examination as to his personal knowledge of Queen's identity:

> "Officer Cunningham, at the time of this alleged escape were you in direct supervisory control of Mr. Queen?
>
> A No, I was not.
> At that time did you know Mr. Queen?
>
> A No, I did not.
> Did you know him personally now?
>
> A No, I do not.
> Now the entries that have been introduced into evidence over objection did you make any of those yourself?
>
> A No, I did not."

Apparently recognizing some weakness in identification the State called the officer who had "participated in returning ... Arvin Queen to the Maryland House of Correction." The officer had gone with another to pick up Mr. Queen at the jail. He was asked:

> "Did there ever come a time that Mr. Queen identified himself to you?
>
> A No, he didn't identify himself to me because I stayed outside and Kershaw went inside and made the identification and took custody of him."

It was also brought out that the officer at a later date returned to the detention center to assure himself that he could identify appellant:

> "And do you recall what the purpose of calling Mr. Queen to Center Hall was for?
>
> A Yes, I do.
> Will you tell His Honor why you called Mr. Queen to Center Hall?

A   To put a name with a face.

In other words so that you could see him to identify him today?

A   By name.

Prior to October the 7th, 1974, did you know Mr. Queen personally?

A   No, sir.

And on the day that you say you were in Annapolis you could not, or you did not make any identification of Mr. Queen on that day, did you?

A   No, sir.

He did — he was not identified to you on that day, was he?

A   No, sir.

So you really don't know who you picked up in Annapolis, do you?

A   We picked up Arvin Queen.

Well is that based on the identification you made at the Maryland House of Correction on October the 7th?

A   Based on the identification of the man I brought back from Annapolis who I was assigned to go get.

But you find it necessary to have a meeting with him so that you could see prior to this morning, earlier this month?

A   To affiliate the name with the face, yes, sir.

Well prior to October the 7th could you have identified Arvin Queen?

A   To October 7th?

Prior to the meeting in Center Hall?

A   I could identify him by the face, not by name, no."

Upon objection the court ruled:

"COURT: Well, I don't think whether he identifies his face here today is even relevant because he has testified that he picked up one Arvin Queen and returned him to the Institution in May of 1974 and whether he points him out on the stand today is really not too significant. But if it would make you feel better I'll strike the visual identification since I don't think he really had the visual identification based on what he saw on May the 26th, 1974 but rather on what he saw in the Institution."

. . .

"MR. DRYDEN: Your Honor, just for clarity then, the testimony in which he identified him that he picked up a person named Arvin Queen in Annapolis —

"COURT: No, that is not stricken. That is still admissible. That is not stricken."

As its ultimate effort the State now argues that Queen's appearance in court served as sufficient identification:

" ... the identity of the individual at trial was established prior to the taking of any testimony when appellant's case was called for trial." [1]

Treating the identity contentions inversely, we find precious little merit in any, but no merit in the latter.

---

1. The State refers to appellant's appearance in court and his appointed attorney's response when Queen's case was called:

"MR. DRYDEN:     Next, Your Honor, the State would call Criminal No. 15,968, Arvin Queen.

COURT:     Alright, Mr. Queen, are you familiar with the charge?

MR. LOWMAN:     Yes, Your Honor, Mr. Queen is familiar with the charge and he understands he is charged with escape. He is aware of his right to a jury trial and elects to be tried before this court, waiving the right to a jury trial, and at this time, Your Honor, we would enter a plea of Not Guilty to the charge."

Appellant was present in court when his case was called because he was *brought* to court still in the custody of gaolers. His attorney's plea of "not guilty" placed in issue every element of the crime including appellant's identity as the "Arvin Queen" who had escaped from custody two years prior. The issue of identity must be settled before that of guilt becomes relevant. *United States v. Hecht*, 22 F. 2d 264, 265. Certainly the "not guilty" plea may not be said to waive the State's burden of proving a defendant's identity, *Cf. Jones v. State*, 10 Md. App. 420, *cert. denied* 260 Md. 721. Had appellant stood mute [2] the court would undoubtedly

---

2. When a prisoner obstinately stood mute as opposed to *ex visitatione Dei* (by the visitation of God) the old courts of England were less understanding in their proceedings:

"Penalty for obstinately standing mute. — If he be found to be obstinately mute (which a prisoner hath been held to be that hath cut out his own tongue), (*k*) then if it be on an indictment of high treason, it hath long been clearly settled, that standing mute is an equivalent to a conviction, and he shall receive the same judgment and execution. (*l*) And as in this the highest crime, so also in the lowest species of felony, viz.: in petit larceny, and in all misdemeanors, standing mute hath always been equivalent to conviction. But upon appeals and indictments for other felonies, or petit treason, the prisoner was not, by the ancient law, looked upon as convicted, so as to receive judgment for the felony; but should, for his obstinacy, have received the terrible sentence of *penance* or *peine* (which, as will appear presently, was probably nothing more than a corrupted abbreviation of *prisone*) *forte et dure* (strong and hard).

Before this was pronounced the prisoner had not only *trina admonitio* (a third warning), but also a respite of a few hours, and the sentence was distinctly read to him, that he might know his danger; (*m*) and, after all, if he continued obstinate, and his offence was clergyable, he had the benefit of his clergy allowed him, even though he was too stubborn to pray it. (*n*) Thus tender was the law of inflicting this dreadful punishment; but if no other means could prevail, and the prisoner (when charged with a capital felony) continued stubbornly mute, the judgment was then given against him without any distinction of sex or degree. A judgment, which was purposely ordained to be exquisitely severe, that by that very means it might rarely be put in execution.

.... The English judgment of penance for standing (*u*) mute was as follows: that the prisoner be remanded to the prison from whence he came, and put into a low, dark chamber; and there be laid on his back, on the bare floor, naked, unless where decency forbids: that there be placed upon his body as great a weight of iron as he could bear, and more; that he have no sustenance, save only, on the first day, three morsels of the worst bread; and on the second day, three draughts of standing water, that should be nearest to the prison door; and in this situation this should be

have interposed such a plea. Md. Rule 721. *Accord,* Hochheimer's *Criminal Law,* (2nd Ed.) § 113.

This leaves the State with but two sources of identification: the police officer who transported appellant from one jail to another and the custodian who compared appellant to a picture in a record.

The police officer admitted that he did not know Arvin Queen; however, the judge permitted him to testify that "he picked up a person named Arvin Queen in Annapolis . . . ." This was clearly insufficient as attested by his responses:

> "And on the day that you say you were in Annapolis you could not, or you did not make any identification of Mr. Queen on that day, did you?
>
> A   No, sir.
>
> He did — he was not identified to you on that day, was he?
>
> A   No, sir."

Thus we are left with the custodian's opinion that appellant and the base file photograph are one and the same person. However that opinion, expressed without a foundation properly laid, usurped the function of the trier of fact by precluding the factfinder from testing the opinion by its own comparison.

The base file record, identified as made in the course of business, was not offered pursuant to Cts. Art., § 10-101 (formerly Art. 35, § 59) but was dissected and submitted sheet by sheet as the State deemed relevant. These sheets included the commitment of Arvin Queen, dated February 25, 1973, and Mr. Queen's "Employee's Initial Escape Report," dated December 14, 1971. The State did *not* introduce the "base files . . . photo[s] of the records to whom [it] pertain[ed]," from which the custodian expressed his identification opinion by comparison.

---

alternately his daily diet *till he died,* or (as anciently the judgment ran) *till he answered. (v)*" II *Cooley's Blackstone,* (4th Ed.) at 1473-1475.

In *Goodman v. State*, 2 Md. App. 473 [Chief] Judge Orth faced similar testimony of a conclusion drawn by a custodian witness from business records of a telephone company. Ironically, there the State attempted "to prove that James R. Barton, M.D. *did not exist. . . ."* [Emphasis added].

Judge Orth wrote:

"Md. Code, (1965 Repl. Vol.), Art. 35, § 59 provides that any writing or record made as record of any act, transaction, occurrence or event in the regular course of any business shall be admissible in evidence in proof of said act, transaction, occurrence or event. All circumstances of the making of such record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight but not the admissibility thereof. The rule applies in criminal as well as civil cases. *Lauder v. State*, 233 Md. 142; *Dunn v. State*, 226 Md. 463. The statute permits the introduction of business records even though hearsay in nature, when the entry meets the test of 'necessity and circumstantial guaranty of trustworthiness.' *Morrow v. State*, 190 Md. 559, 562. Summaries or compilations made from such records may be admissible, when a proper foundation has been laid by a qualified witness on the stand. *O'Donnell v. State*, 188 Md. 693. A witness called to the stand and qualified, *after records have been put into evidence,* may testify as to his conclusion therefrom. *Smith v. Jones*, 236 Md. 305. In the instant case, however, the records were not in evidence. The witness was asked, '(W)hat do your records show about this telephone? ' and his reply indicated *his conclusion* as to what they showed. It does not appear that he read directly from the records. We do not think that the exception to the hearsay rule, permitted by the statute, goes this far. See *Jones v. State*, 205 Md. 528. We feel that

> the trial court erred in allowing the testimony in evidence, although the records themselves may have been admi.sible. Once admitted, the witness, if properly qualified, could have testified as to his conclusion ` therefrom." [Emphasis added]. *Goodman*, 2 Md. App. at 476-477.

We apply the same rule here. Had the State introduced the base file containing the photograph into evidence the conclusion from the comparison would have been subject to further comparison by the trier of the facts. That not having been done, the custodian's comparison opinion was clearly inadmissible and other evidence of identity was so sparse as to hardly justify the term minimal.

While an escape trial is often an uncomplicated proceeding, we think it not too much to ask that the State identify the defendant as the escapee. The far better practice, of course, is to have the identification made by one who knows him to be the person accused.

*Judgment reversed.*
*Case remanded for retrial.*