First degree murder; sentence: life imprisonment.
Mary Crook of Pulaski, Tennessee, testified that the victim, William T. Marsh, was her brother and that she had seen him almost daily for most of his life. She stated that her brother was a kidney patient at Vanderbilt Medical Center and required routine checkups. Crook testified that she last saw her brother alive on January 3, 1979. After the Fayetteville, Tennessee police informed her that her brother's truck had been found, Crook filed a missing persons report with the Giles County Sheriff's Department.
Madison County Sheriff's Department Investigator, Al Duffey, testified that at 8:45 A.M. on August 3, 1980 he was called to investigate the remains of a body found on Johnson Mountain in Northeast Madison County. Accompanied by Capt. C.W. Owens and reserve deputy Tommy Hooper, Duffey inspected the rocky, heavily vegitated area and found the skeletal remains of a body. Duffey called Roger Morrison of the Department of Forensic Sciences to the scene but by the time he arrived it was too dark to begin an investigation. Duffey had the area secured for the evening.
The next morning Duffey, Morrison and Deputy Parker returned and made a detailed investigation of the area. They gathered numerous bones, deteriorated items of clothing, and a deteriorated billfold containing a plastic Vanderbilt University Medical Center card in the name of the victim. Duffey stated that Morrison took several photographs of the scene, including one depicting a "blue, red and white checked or diamond shaped" homemade quilt, and made a diagram of the area.
Madison County reserve deputy Tommy Hooper testified that on August 3 he accompanied Duffey to the site of the remains of the victim. Hooper stated that he had lived in the area all of his life and hunted in the mountains for twelve to fifteen years. Hooper was familiar with the landmarks of the area and knew of an old house and cemetery located north of the site where the victim was found. He stated that both were located in Madison County.
Hooper testified that the boundary between Madison County and Jackson County, Tennessee was located on top of the mountain where the victim was found. He stated that an old road ran along the top of the mountain on the county line and was east of the site where the victim was found. Hooper stated that the victim was found in Madison County.
Criminalist Roger Morrison testified that he examined the remains and clothing of the victim and discovered a semi-circular "nick" containing minute metal fragments in the first right rib under the collarbone and in the manubrium. Tests were run on these bones under Morrison's close direction and supervision at the Georgia State Crime Lab in Atlanta. Morrison stated that the tests took about eight hours to complete and revealed minute copper fragments embedded in the "nick" of the rib bone. Morrison stated that the copper could have come from a jacketed bullet. *Page 278 
Columbus Jones testified that for twenty-one years he had served as chief clerical supervisor of the X-ray file division of Vanderbilt Medical Center and was custodian of all X-rays made at Vanderbilt Hospital. At the State's request, Jones searched his files to determine whether any X-rays of the victim existed. Jones found a file bearing the victim's name and containing seventy-seven X-rays. The file was the only one bearing the victim's name under his custody. He identified one X-ray of the victim, State's Exhibit 13, as having been removed from the file. Jones stated that he did not make the X-rays or know who did.
Forensic Pathologist Dr. Joseph Embry testified that he examined the remains of the victim in order to determine their identity and the cause of death. Dr. Embry compared X-rays of the victim made at Vanderbilt Hospital of his pelvic, shoulder and left collarbone with X-rays he had made of those bones. The comparison left no doubt as to the identity of the remains as those of the victim.
Dr. Embry noted that the "nick" in the rib bone was consistent with the type of injury left by a gunshot wound. He stated that the injury was in existence when the victim was left on the mountain. He noted that the injury could have existed about six weeks prior to January, 1979, although the bone revealed no evidence of healing in the affected area. Dr. Embry opined that the victim died of a gunshot wound to the chest.
Juanita Green testified that she resided in Pulaski, Tennessee, and was acquainted with both the victim and the appellant.
On a Friday night during the Spring of 1979, Ms. Green had a conversation with appellant. They began to talk about the victim and appellant told Green that she had shot the victim on the mountain and her partner, Norman Clack, had emasculated the victim. Ms. Green questioned appellant about "the quilt"[1] and appellant's response was to ask Green why was she being so "nosey."
Ms. Green testified that she and appellant had a subsequent conversation. She asked appellant about the victim's money to which appellant replied that the money was laying on the ground beside him. Ms. Green again inquired about "the quilt" but appellant did not respond. Ms. Green did not discuss the conversations with anyone.
Beverly Crook testified that she also resided in Pulaski, Tennessee, knew the victim, and was a cousin of the appellant.
Sometime prior to May, 1979, Ms. Crook had a conversation with appellant concerning the victim. Appellant had come to Crook's residence, bringing with her a homemade quilt that she said her sister had made. Ms. Crook stated that appellant became upset and began to cry. Appellant asked Ms. Crook if Crook would help her get rid of a weapon and stated that she would pay her [Crook]. Appellant did not specify the type of weapon. Appellant told Ms. Crook how she and Clack had killed the victim. She told of them riding with the victim in his truck and seeing his money. She stated that the victim begged them not to kill him. Appellant said she shot the victim once and was going to carry him to a doctor, but when he began to bleed from the mouth they "finished him off."
Appellant told Ms. Crook about the victim's emasculation by Clack. Appellant stated that they wrapped the victim's body in a quilt, similar to one that appellant had brought with her when she talked to Ms. Crook, and rolled him into some bushes.
Appellant presented several character witnesses on her behalf and a witness who testified that Ms. Green had told him that the authorities had forced her to testify falsely against appellant. Appellant took the stand and denied having the conversations with Green and Crook, and denied committing the crime.
 I
Appellant challenges the sufficiency of the State's evidence and specifically points to its failure to prove venue. *Page 279 
In a criminal case, proof of venue is sufficient if it can be reasonably inferred by the jury from the facts and circumstances adduced. Segars v. State, 409 So.2d 1003
(Ala.Cr.App. 1982). Venue need not be established solely by direct evidence. Evidence from which it is inferrable is sufficient. Dolvin v. State, 391 So.2d 666 (Ala.Cr.App. 1979),aff'd, 391 So.2d 677 (Ala. 1980); Stokes v. State,373 So.2d 1211 (Ala.Cr.App.), cert. denied, 373 So.2d 1218 (Ala. 1979). Venue may be established by the testimony of one witness.McCrary v. State, 398 So.2d 752 (Ala.Cr.App.), cert. denied,398 So.2d 757 (Ala. 1981); Wilson v. State, 384 So.2d 1243
(Ala.Cr.App. 1980).
It is not necessary that proof of the location of a county boundary line be by expert testimony. Such may be proven by general reputation. Nolen v. State, 35 Ala. App. 249,45 So.2d 786, cert. denied, 253 Ala. 565, 45 So.2d 792 (1950); Melton v.State, 21 Ala. App. 419, 109 So. 114 (1926); See generally Mayesv. State, 22 Ala. App. 315, 115 So. 291 (1928).
As we stated in Stokes, supra, at pages 1216-17:
 "When the State offers evidence tending to show that the crime was committed within the jurisdiction of the court, the question of venue becomes one for the jury. . . . Where there is no evidence of venue it is a question for the court; but if there is evidence of venue and it is in conflict, it is a question for the jury. . . . The inferences to be drawn from the evidence, when susceptible of more than one rational conclusion, are for the jury and not for this Court to determine. . . . A verdict on conflicting evidence is conclusive on appeal. . . ."
(Citations omitted).
In the instant case, although the exact spot where the victim was killed was not shown by direct evidence, the jury could properly conclude from the evidence adduced that he was killed in Madison County. Consequently, the trial court properly overruled appellant's motion to exclude on this ground. Harrisv. State, 395 So.2d 1063 (Ala.Cr.App. 1980), cert. denied,395 So.2d 1069 (Ala. 1981); Ala. Code § 15-2-2 (1975).
 II
A careful review of the evidence reveals that the state sufficiently established a prima facie case of first degree murder. Thus, the trial court properly overruled appellant's remaining grounds on her motion to exclude. Dolvin v. State,391 So.2d 133 (Ala. 1980); Cumbo v. State, 368 So.2d 871
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979); Ala. Code § 13-1-70 (1975).
 III
Appellant contends that the trial court erred in admitting State's Exhibit 13, a pelvic X-ray of the victim taken at Vanderbilt Hospital, as it was not properly authenticated.
Columbus Jones testified that the victim's X-rays taken at Vanderbilt Hospital were made in the ordinary course of business. He stated that it was the regular business of the hospital to make and preserve such. Jones testified that the X-ray became a permanent part of the patient's record shortly after it was taken. He stated that the records over which he has custody are a true and accurate reflection of the transaction at the time they were made. Jones stated that the X-ray in question was made by an X-ray technologist.
In Austin v. State, 354 So.2d 40, 42 (Ala.Cr.App. 1977),cert. denied, 354 So.2d 44 (Ala. 1978), we quoted with approval Gamble, McElroy's Alabama Evidence § 254.01 (3) (3rd ed. 1977), which discusses the authentication necessary to properly admit into evidence a business record:
 "In order to properly authenticate a business record, any witness (frequently the custodian of the record) must testify: `that the document now exhibited to him is a record of the business; that he knows the method (i.e., the standard operating procedure) used in the business of making records of the kind now exhibited to him; and that it was the regular practice of the business to make records of such kind *Page 280 
and to make them at the time of the event recorded or within such specified period thereafter as could be found by the trier of fact to be reasonable.'"
Once the above predicate is laid, the record is admissible even though the maker or entrant has no personal knowledge of the truth of the matter recorded. Meriwether v. CrownInvestment Corporation, 289 Ala. 504, 268 So.2d 780 (1972);Speigle v. Chrysler Credit Corporation, 56 Ala. App. 469,323 So.2d 360, cert. denied, 295 Ala. 420, 323 So.2d 367 (1975);McElroy's, § 254.01 (2).
It is clear that the state properly established the predicate for admission of the X-ray into evidence under the business records exception to the hearsay rule. Salotti v. SeaboardCoastline Railroad Co., 293 Ala. 1, 299 So.2d 695 (1974);Billingsley v. State, 402 So.2d 1052 (Ala.Cr.App. 1980), rev'don other grounds, 402 So.2d 1060 (Ala. 1981); Ala. Code §12-21-43 (1975). Thus, appellant's contention is without merit.
 IV
Appellant argues that the trial court erred in admitting the test results performed on the victim's rib at the Georgia State Crime Lab. She asserts that since Morrison did not personally perform the tests he could not know whether the instruments were performing properly.
Morrison testified that while he did not personally perform the tests on the rib bone, he was present and directed them. He closely observed every phase of the testing and supervised them. The tests were run by an employee of the Georgia State Crime Lab.
The record is clear that the tests performed on the victim's rib bone were conducted under the close direction and supervision of Morrison and were performed under conditions which would not impeach the reliability of the testing procedure. The record fully supports the conclusion that the test instruments were properly adjusted and operated. We find no error in their admission into evidence. Dolvin v. State,391 So.2d 677 (Ala. 1980); Whetstone v. State, 407 So.2d 854
(Ala.Cr.App. 1981).
 V
Appellant contends that the trial court erred in refusing to give six of her written requested charges. Appellant failed to object or except to the refusal of any of the charges. Consequently, she did not properly preserve their refusal for our review. Jones v. State, 412 So.2d 1270 (Ala.Cr.App. 1982);Jones v. State, 412 So.2d 1247 (Ala.Cr.App. 1982); McCowan v.State, 412 So.2d 847 (Ala.Cr.App. 1982); Allen v. State,414 So.2d 989 (Ala.Cr.App. 1981), affirmed, 414 So.2d 993 (Ala. 1982).
We have examined appellant's contentions on this appeal and find no error. The judgment of conviction by the Madison Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.
[1] Undoubtedly, the quilt to which Ms. Green was referring was the one found at the scene and depicted in a photograph introduced into evidence by the State without objection.