672 A.2d 1115

**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES**

**v.**

**Gregory COLE.**

**No. 59, Sept. Term, 1995.**

Court of Appeals of Maryland.

March 12, 1996.

Lawrence P. Fletcher–Hill (J. Joseph Curran, Jr., Attorney General, Michael O. Doyle, Assistant Attorney General, on brief) Baltimore, for Petitioner.

Hillary Galloway Davis (J. Edward Davis, on brief) Towson, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

CHASANOW, Judge.

We are called upon in the instant case to determine whether a videotape may be admissible in evidence in an administrative hearing even though no witness testifies that what is depicted on the videotape is a fair and accurate representation of what it purports to show. For the following reasons, we answer in the affirmative and hold that the videotape was properly admitted into evidence. We therefore reverse the Court of Special Appeals and affirm the decision of the administrative

law judge admitting the videotape into evidence and terminating Respondent's employment based on Respondent's conduct depicted in the videotape.

## I.

This appeal arises out of an administrative proceeding initiated by Petitioner, the Department of Public Safety and Correctional Services (Department), for the removal of Respondent, Gregory Cole, from his employment as a Correctional Officer Lieutenant at the Roxbury Correctional Institution in Hagerstown. Cole was part of an "extraction team" assembled to remove a disruptive inmate from his prison cell and move him to another area. This process was videotaped in accordance with routine procedures of the correctional institution. According to the findings of the administrative law judge (ALJ) who presided over the hearing, the videotape showed that gas was initially used by the extraction team to subdue the inmate in his cell. The ALJ found that after the inmate was incapacitated and lying on the floor, Cole opened the cell door and kicked the inmate in the head, shoulder and rib area, stepped on the inmate, lifted the inmate's legs four or five feet from the floor by his leg irons and dropped him several times. The inmate was then removed from the cell. Cole's actions were brought to the attention of the warden several months later when the videotape was viewed by staff members of the prison reviewing extraction tapes to be used for training purposes. Charges for Cole's removal were then filed.

At the hearing held before the ALJ at the Maryland Correctional Training Center in Hagerstown, the Department offered the testimony of Warden John P. Galley. Galley testified that it is the regular practice of the institution to videotape cell extractions.[1] Once made, Galley explained, the

---

1. When asked "[w]hat is the normal procedure to be followed in a cell extraction," Galley testified:

 "Officers are trained to extract the inmate from the cell. When a[n] extraction occurs, a team of officers is to go in. The team usually

tapes are marked with the date and time of the extraction, the names of the inmate and the extraction team members, and are maintained in a vault in the security office. Galley was asked if he knew whether there was a cell extraction in which Cole was involved on the date in question and whether he knew if it was videotaped. After answering affirmatively to both questions, Galley identified the videotape and stated that he had personally reviewed it. Galley acknowledged that he was not present at the extraction itself and viewed the tape only after it was brought to his attention several months later.

The Department sought to introduce, through Galley, the videotape along with the envelope that contained the tape and a document stapled to the envelope showing the chain of custody of the videotape. Cole timely objected to admission of the videotape. The ALJ overruled the objection and admitted the videotape, envelope and attached chain of custody form into evidence. While the tape was played before the ALJ, Galley identified Cole as the officer in the video entering the cell and kicking the inmate. Cole testified and admitted that he was shown on the videotape, but denied using excessive force against the inmate. After viewing the tape, the ALJ found that Cole committed a third category infraction by use of unnecessary force upon the inmate and terminated Cole's employment in accordance with the Department's mandatory sanction for that type of violation.

Cole filed exceptions to the ALJ's decision with the Secretary of Personnel. After a hearing, a designee of the Secretary issued an order adopting the proposed findings of fact and conclusions of law of the ALJ and sustained Cole's removal from state service.

---

consists of one officer using a shield for purposes of taming an inmate. And four officers behind that person following the shield man into the cell for purposes of one officer to be assigned to grab each extremity of the body, two arms, two legs. A sixth officer is behind that group using a video camera. A seventh officer is in command of the entire unit and situation as it occurs."

Cole then appealed to the Circuit Court for Washington County, arguing that the videotape was improperly admitted into evidence "[s]ince there was nobody there to authenticate the tape and nobody there to say, in fact, if the tape reflected what had happened was accurate." The circuit court judge, agreeing with Cole, reversed the decision of the ALJ and the Secretary of Personnel and reinstated Cole to his position of Correctional Lieutenant. The judge held that the videotape was not properly authenticated because it was "admitted in evidence without any foundation being laid whatsoever."

The Department filed a timely notice of appeal to the Court of Special Appeals. The intermediate court held, *inter alia,* that the circuit court was correct in ruling that the videotape was inadmissible for lack of authentication and affirmed that part of the circuit court's decision. *Dept. of Public Safety v. Cole,* 103 Md.App. 126, 652 A.2d 1159 (1995). We granted certiorari to consider whether the videotape was properly authenticated and thus admissible.

## II.

Cole contends that the videotape was not properly authenticated because the Department did not produce a witness who was present at the extraction to testify to the videotape's accuracy. Cole argues that a videotape, much like a photograph, must be authenticated by a witness with first-hand knowledge who can testify that what is depicted is a correct and accurate representation of what it purports to show. Although we agree that this is one method of authenticating a videotape, it is not the sole method.

Videotapes are generally admissible in evidence on the same basis as motion picture films and subject to the same general rules applicable to photographic evidence. *Tobias v. State,* 37 Md.App. 605, 615, 378 A.2d 698, 704 (1977); 3 CHARLES C. SCOTT, PHOTOGRAPHIC EVIDENCE § 1294, at Supp. 106–23 (2d ed. 1969 & 1994 Supp.) (citing numerous cases). Photographs can be admissible under one of two distinct rules. Typically, photographs are admissible to illustrate the testimo-

ny of a witness when that witness testifies from first-hand knowledge that the photograph fairly and accurately represents the scene or object it purports to depict as it existed at the relevant time. *See* 2 McCORMICK ON EVIDENCE § 214, at 13 (John W. Strong ed., 4th ed. 1992); 6 LYNN McLAIN, MARYLAND EVIDENCE § 901.2, at 491 (1987). Since the Department did not produce a witness who, based on personal observation, could verify that the videotape accurately represents the cell extraction, the videotape could not have been admitted into evidence under this first rule. *See Wimpling v. State*, 171 Md. 362, 373–74, 189 A. 248, 254 (1937).

 There is also, however, a second, alternative method of authenticating photographs that does not require the testimony of a witness with first-hand knowledge. The "silent witness" theory of admissibility authenticates a photograph as a "mute" or "silent" independent photographic witness because the photograph speaks with its own probative effect. *See Sisk v. State*, 236 Md. 589, 591–92, 204 A.2d 684, 685 (1964) and citations therein; 3 PHOTOGRAPHIC EVIDENCE § 1294, at Supp. 106. A majority of jurisdictions and authorities recognize the viability of the "silent witness" theory of admissibility. *See, e.g., Fisher v. State*, 7 Ark.App. 1, 643 S.W.2d 571, 575–76 (1982) and cases cited therein; *Bergner v. State*, 397 N.E.2d 1012, 1015–16 (Ind.Ct.App.1979) and cases cited therein; 2 McCORMICK ON EVIDENCE § 214, at 15. Professor Wigmore, explaining the rationale behind this theory, states:

"With later advancements in the art of photography ... and with increasing awareness of the manifold evidentiary uses of the products of the art, it has become clear that an additional theory of admissibility of photographs is entitled to recognition. Thus, even though no human is capable of swearing that he personally perceived what a photograph purports to portray (so that it is not possible to satisfy the requirements of the 'pictorial testimony' rationale) there may nevertheless be good warrant for receiving the photograph in evidence. Given an adequate foundation assuring the accuracy of the process producing it, the photograph

should then be received as a so-called silent witness or as a witness which 'speaks for itself.'" (Footnote omitted).

3 WIGMORE ON EVIDENCE § 790, at 219–220 (Chadbourn rev. 1970). Wigmore then quotes at length what he considers a "forceful opinion" from California detailing the need for the "independent silent witness" theory. 3 WIGMORE ON EVIDENCE § 790, at 220–221. As stated in *People v. Bowley*, 59 Cal.2d 855, 31 Cal.Rptr. 471, 382 P.2d 591 (1963),

"photographs are useful for different purposes. When admitted merely to aid a witness in explaining his testimony they are, as Wigmore states, nothing more than the illustrated testimony of that witness. But they may also be used as probative evidence of what they depict. Used in this manner they take on the status of independent 'silent' witnesses.

\* \* \* \* \* \*

X-ray photographs are admitted into evidence although there is no one who can testify from direct observation inside the body that they accurately represent what they purport to show.

There is no reason why a photograph or film, like an X-ray, may not, in a proper case, be probative in itself. To hold otherwise would illogically limit the use of a device whose memory is without question more accurate and reliable than that of a human witness." (Citations and footnote omitted).

*Bowley*, 31 Cal.Rptr. at 474–75, 382 P.2d at 594–95.

McCormick explains that:

"Under this doctrine, commonly referred to as the 'silent witness' theory of admission, photographic evidence may draw its verification, not from any witness who has actually viewed the scene portrayed on film, but from other evidence which supports the reliability of the photographic product. ... Today the 'silent witness' doctrine affords an alternative route to the introduction of photographic evidence in virtually all jurisdictions." (Footnotes omitted).

2 McCormick on Evidence § 214, at 15. *See generally* James McNeal, *Silent Witness Evidence in Relation to the Illustrative Evidence Foundation,* 37 Okla.L.Rev. 219 (1984).

 This Court, in *Sisk, supra,* relied upon the "silent witness" theory to uphold the admission of a Regiscope photograph [2] without a witness to verify its accuracy. In considering for the first time this method of authenticating photographs,[3] we noted that there are circumstances where photographs may be admitted into evidence as probative, substantive evidence because they act as " 'silent witnesses who speak for themselves,' " rather than solely to add to or illustrate the testimony of a human witness. *Sisk,* 236 Md. at 592, 204 A.2d at 685 (citation omitted). Of course, the photograph must still be a "reasonably accurate and honest representation ... of the facts it purports to represent," *Sisk,* 236 Md. at 592–93, 204 A.2d at 685, but a witness with personal knowledge is not required to lay that foundation.

We held in *Sisk* that because the "possibility of the photograph not representing the transaction it purport[ed] to [wa]s extremely remote," 236 Md. at 596, 204 A.2d at 687, and the "possibility of error in the photograph ... almost *nil,* in the absence of some intentional trickery to 'fake' the photograph," the evidence was admissible under the "silent witness" doctrine. 236 Md. at 596–97, 204 A.2d at 688. Extrinsic evidence proved when, where, and under what circumstances the photograph was taken and showed that it accurately represented its

---

2. A Regiscope camera simultaneously photographs a person cashing a check, the identification used by that person and the check itself, by means of a two-lens camera. *Sisk v. State,* 236 Md. 589, 594, 204 A.2d 684, 686 (1964).

3. We note that although this Court has never expressly so stated, X-ray photographs are ordinarily admitted into evidence under the "silent witness" theory. The reason is that since an X-ray photographs objects that the human eye cannot see, no witness is able to testify that the X-ray fairly and accurately reflects what it purports to show. *See Fisher v. State,* 7 Ark.App. 1, 643 S.W.2d 571, 574 (1982); 2 McCormick on Evidence § 214, at 14–15 (John W. Strong ed., 4th ed. 1992).

subject. Furthermore, the trial judge found the evidence helpful and relevant.

If videotape evidence is generally admissible under the same rules as photographic evidence, the issue then becomes whether we may admit the videotape under the "silent witness" theory of admissibility. Other courts have adopted the "silent witness" theory to admit videotape evidence. In *Fisher, supra,* for example, the appellant was convicted of theft of property from a grocery store based in part on a videotape derived from a surveillance camera installed in the store by the owner. The owner testified that, prior to the time Fisher entered the store, he had adjusted the camera, began recording, checked that it was working properly, and then left the premises. The unattended camera captured video of Fisher and her daughters "sacking groceries, and removing them" from the store. *Fisher,* 643 S.W.2d at 573. The trial court admitted the videotape into evidence, finding that a proper foundation established that the tape fairly represented the events occurring at the store. The Court of Appeals of Arkansas, recognizing that types of photographic evidence may be admitted under two different theories, the "pictorial testimony" theory and the "silent witness" theory, held that the videotape was properly admitted under the latter theory. *Fisher,* 643 S.W.2d at 573–575. The court explained:

"Photographic evidence is the best available means of preserving the appearance of a scene at a given time. It is superior to eyewitness testimony in certain respects. Eyewitness testimony is subject to errors in perception, memory lapse, and a witness' problem of adequately expressing what he observed in language so that the trier of fact can understand. Photographic evidence can observe a scene in detail without interpreting it, preserve the scene in a permanent manner, and transmit its message more clearly than the spoken word.

We hold that photographic evidence is admissible where its authenticity can be sufficiently established in view of the context in which it is sought to be admitted. Obviously, the foundational requirements for the admissibility of photo-

graphic evidence under the 'silent witness' theory are fundamentally different from the foundational requirements under the 'pictorial testimony' theory. It is neither possible nor wise to establish specific foundational requirements for the admissibility of photographic evidence under the 'silent witness' theory, since the context in which the photographic evidence was obtained and its intended use at trial will be different in virtually every case. It is enough to say, that adequate foundational facts must be presented to the trial court, so that ... the trier of fact can reasonably infer that the subject matter is what its proponent claims."

*Fisher,* 643 S.W.2d at 574–575.

The Court of Appeals of Virginia also held that "[v]ideotapes, like photographs, when properly authenticated, may be admitted under either of two theories: '(1) to illustrate the testimony of a witness, and (2) as "mute," "silent," or "dumb" independent photographic witnesses.' " *Brooks v. Com.,* 15 Va.App. 407, 424 S.E.2d 566, 569 (1992) (citation omitted). *Brooks* involved a videotaped drug transaction between Brooks and a police informant. The State authenticated the videotape by showing that tabs allowing alteration of the tape were removed and that the videotape contained an on-screen display of the seconds that had passed. In addition, three police officers verified that the voice on the tape was that of Brooks even though "none of the officers testifying actually observed [the drug transaction] taking place." *Brooks,* 424 S.E.2d at 568. The court found this evidence to constitute "more than adequate grounds for determining that the tape was an accurate representation of what it purported to depict." *Brooks,* 424 S.E.2d at 569. Hence, the videotape evidence was held admissible under the "silent witness" theory. *See also United States v. Pageau,* 526 F.Supp. 1221, 1224 (N.D.N.Y.1981) (testimony as to installation, activation, operation and chain of possession of videotape depicting correctional officers beating inmate was sufficient foundation); *Bowley,* 31 Cal.Rptr. at 475, 382 P.2d at 595 (holding motion picture film to be probative evidence in itself under the silent witness theory); *State v. Young,* 303 A.2d 113, 116 (Me.1973) (testimo-

ny as to installation, testing and custody of film from bank's automatic camera justified admission of film as independent evidence).

Most leading authorities also agree that videotape evidence should be admissible under the silent witness theory. McCormick believes that since "[t]he 'silent witness' theory of admissibility is as fully applicable to the motion picture as to the still photograph," the doctrine is "equally applicable" to videotape evidence. 2 McCORMICK ON EVIDENCE § 214, at 17–18. *Accord* 3 PHOTOGRAPHIC EVIDENCE § 1294, at Supp. 106 (commenting that videotapes may be admitted either to illustrate testimony or as an independent silent witness).

 In view of the aforegoing, we agree that a videotape can be admissible under the "silent witness" theory if properly authenticated. Authenticating videotape evidence under this theory obviously requires a different foundation than necessary to authenticate photographic evidence to illustrate the testimony of a witness. Most authorities and jurisdictions agree that in order to authenticate photographic evidence under the "silent witness" doctrine, the proponent must lay an adequate foundation assuring the accuracy of the process that produced the photo. *See* 3 WIGMORE ON EVIDENCE § 790, at 220; *see also Bergner,* 397 N.E.2d at 1017 (requiring proof that photograph was not altered and suggesting other non-mandatory guidelines for admission of photographs under silent witness theory).

 We decline to adopt any rigid, fixed foundational requirements necessary to authenticate photographic evidence under the "silent witness" theory. The facts and circumstances surrounding the making of the photographic evidence and its intended use at trial will vary greatly from case to case, and the trial judge must be given some discretion in determining what is an adequate foundation. *See Fisher,* 643 S.W.2d at 575; *Bergner,* 397 N.E.2d at 1017. We do note that a foundation is adequate, at least for an administrative hearing, if there are sufficient indicia of reliability so that the trier

of fact can "reasonably infer that the subject matter is what its proponent claims." *Fisher*, 643 S.W.2d at 575.

Since the "silent witness" theory applies to videotape evidence, we must now determine whether the videotape in the case *sub judice* was sufficiently authenticated. As warden, Galley was competent to testify to the routine practices of the prison. Rule 5–406 states that "[e]vidence of the ... routine practice of an organization is relevant to prove that the conduct of the ... organization on a particular occasion was in conformity with the ... routine practice." Galley testified at the hearing that cell extractions are ordinarily videotaped at the institution. In addition, Galley verified that each videotape is routinely labelled with the date and time of the extraction and the names of the inmate and officers involved. Galley explained that the videotapes are kept in an individual envelope and are stored in a security vault at the institution where they may be viewed only by signing in and out on a chain of custody form. It is also not disputed that Officer Cole was depicted in the videotape. We believe this evidence is sufficient to prove in an administrative hearing that the videotape was properly made in conformity with the routine practice of the prison and thus, supports the trustworthiness and reliability of the videotape.

It is evident that the possibility of tampering with or distortion of the videotape was extremely remote. No issue was raised concerning the accuracy of the video process, and there was no suggestion that the video camera was working improperly or that the tape was altered. In addition, the ALJ found the videotape to be relevant and useful. Based on the totality of the circumstances, we hold that the videotape at issue was sufficiently authenticated as a "silent witness" and was therefore properly admitted into evidence by the ALJ.

## III.

### A.

Alternatively, the videotape could have been admitted as part of an official record made and kept in the

ordinary course of the correctional institution's business activity. Maryland Rule 5–803(b)(6) sets out the well-established exception to the rule against hearsay for records of regularly conducted business activity. There are times when items made part of and included within an official record can be admitted into evidence as part of a business record admitted under this exception. *See, e.g., Queen v. State,* 26 Md.App. 222, 229–31, 337 A.2d 199, 204 (1975) (indicating that photograph contained in base file would have been included as part of business record had the entire record been introduced). For example, X-ray pictures included within a hospital record have sometimes been admitted under the business records exception.[4] *See* 3 PHOTOGRAPHIC EVIDENCE § 1267, at 118–19; *Coleman v. State,* 423 So.2d 276, 280 (Ala.Crim.App.1982) (admitting X-ray into evidence under business records exception to hearsay rule); *State v. Torres,* 60 Haw. 271, 589 P.2d 83, 86 (1978) (noting that X-rays are included as hospital records admitted under business record statute); *Allen v. St. Louis Public Service Company,* 365 Mo. 677, 285 S.W.2d 663, 667 (1956) (noting that X-rays are generally admissible as part of a duly authenticated hospital record). According to at least one authority, if a witness identifies the hospital record as that of a particular patient and explains how records are ordinarily made and kept, the X-rays taken at the hospital and contained within the hospital record may qualify under the business records exception and be admissible in evidence along with that hospital record. 3 PHOTOGRAPHIC EVIDENCE § 1267, at 118–19. It should be noted, however, that "compliance with the provisions of the [business record exception is] sufficient identification only if there [is] no dispute concerning the identity or reliability of the X-ray films in question." 3 PHOTOGRAPHIC EVIDENCE § 1267, at 119.

In the instant case, the correctional institution's official record consisted of the videotape, the envelope in which it was

---

4. It is well-settled that hospital records, made in the hospital's regular course of business, fall within the business records exception to the rule against hearsay. *State v. Garlick,* 313 Md. 209, 216, 545 A.2d 27, 30 (1988).

stored and the chain of custody form attached thereto. As part of the official record, the videotape could have been admitted under the business records exception if the Department properly authenticated that record.

In order to authenticate a business record, the proponent of the record must establish through testimony that the record was made at or near the time of the act, that it was made by a person with knowledge or from information transmitted by a person with knowledge, that it was made and kept in the course of a regularly conducted business activity, and that it is the regular practice of that business to make and keep records. Md.Rule 5–803(b)(6). This testimony must be given by a witness who possesses the necessary knowledge to establish these facts, but there is no requirement that the witness have first-hand knowledge of the matter reported or that the witness actually have prepared or observed the preparation of the report. 2 MCCORMICK ON EVIDENCE § 292, at 277.

We believe that the videotape was properly authenticated as part of the correctional institution's business records. The Department established, through the testimony of Warden Galley, that it was the regular practice of the correctional institution to make and retain videotaped cell extractions, presumably as a protection for both the inmates and the institution. He also testified that the videotapes are made during cell extractions by a member of the extraction team, and that the videotapes, once made, are marked with the date and time of the extraction, the name of the inmate and the correctional officers involved, and are maintained in a vault in the security office of the institution. Galley, as warden of the correctional institution and presumably supervisor of the custodian of records, possessed the requisite knowledge to establish the foundation for the business records exception. In addition, a chain of custody form attached to the envelope in which the videotape was stored was introduced by the Department. The form listed the names of individuals who "signed out" the videotape from the time it was made to the date of

the hearing. Galley also identified Cole as a member of the extraction team in the videotape as it was viewed at the hearing. Moreover, the videotape, once admitted as part of a business record and played before the ALJ, possessed self-authenticating evidence. The beginning of the videotape shows a member of the extraction team identifying the date, time and location of the extraction as well as a statement concerning what the extraction team will be doing. The same officer makes another statement at the conclusion of the tape explaining that the extraction was completed. Finally, Cole did not challenge the identity or reliability of the videotape and concedes that it portrays him. Taking all of these factors into consideration, we find that there was enough evidence elicited at the administrative hearing to conclude that a record was made and kept in the course of the correctional institution's regularly conducted business and that the videotape was made and kept as a valuable part of that record. Accordingly, we hold that the videotape was sufficiently authenticated to be admitted into evidence under the business records exception.[5]

### B.

■ The Court of Special Appeals was concerned with the possibility of manipulation or tampering with a videotape if a witness with first-hand knowledge does not testify that what the videotape depicts is an accurate representation of what occurred. *See Cole,* 103 Md.App. at 134, 652 A.2d at 1162–63. Authenticating the videotape under the business records exception, however, should alleviate concern over reliability and accuracy. The rationale underlying the business records exception is that because the business relies on the accuracy of its records to conduct its daily operations, the court may accept those records as reliable and trustworthy. *See Chapman v. State,* 331 Md. 448, 459, 628 A.2d 676, 681 (1993); JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 804,

---

**5.** Although it was not argued, it is conceivable that the videotape may also have been admissible as a public record under Maryland Rule 5–803(b)(8).

at 418 (2d ed. 1993). Moreover, the recorder, who has no motive to falsify or record inaccurately, is under a business duty to make an honest and truthful report that can be relied upon by the business. *See State v. Garlick*, 313 Md. 209, 217, 545 A.2d 27, 30–31 (1988); *Aetna Casualty & Surety v. Kuhl*, 296 Md. 446, 454, 463 A.2d 822, 827 (1983). It is therefore unnecessary to call witnesses to testify to the truth of the entries. The business records exception incorporated into Md.Rule 5–803(b)(6), as well as the public records exception incorporated into Md.Rule 5–803(b)(8), contain a statement that a record, otherwise qualified for admissibility under those sections, "may be excluded if the source of information or the method or circumstances of the preparation of the record indicate" that the record lacks trustworthiness. While the videotape meets all of the requirements of a business record, Cole did not meet his burden of proving that it lacked trustworthiness.

Cole never alleged that the Department tampered with or altered the videotape. In addition, although Warden Galley was not present at the extraction, he testified that he had no reason to doubt the accuracy of the videotape. We have held that there is a presumption that public officials properly perform their duties. *Beane v. McMullen*, 265 Md. 585, 602, 291 A.2d 37, 46 (1972); *Lerch v. Md. Port Authority*, 240 Md. 438, 457, 214 A.2d 761, 771 (1965). The reliability associated with the business records exception in addition to the lack of any motive to fabricate, alter or tamper with the videotape provided the record with sufficient guarantees of trustworthiness without the testimony of a witness with personal knowledge. Accordingly, authenticating the videotape of the cell extraction as part of the prison's business records was sufficient to warrant admission into evidence.

## IV.

This Court has recognized that administrative agencies generally are not bound by the technical common law rules of evidence. *Dal Maso v. Bd. of Co. Comm'rs*, 238 Md. 333, 337, 209 A.2d 62, 64 (1965). We have also made clear that

evidence " 'which is inadmissible in a judicial proceeding is not per se inadmissible in an administrative proceeding.' " *Powell v. Maryland Aviation Admin.*, 336 Md. 210, 220, 647 A.2d 437, 442 (1994) (citation omitted). We mandate only that administrative agencies observe the basic rules of fairness as to parties appearing before them, *Dal Maso*, 238 Md. at 337, 209 A.2d at 64, and that they admit evidence that has sufficient reliability and probative value to satisfy procedural due process. *Powell,* 336 Md. at 220, 647 A.2d at 442.

The Administrative Procedure Act, Maryland Code (1984, 1993 Repl.Vol.), State Government Article (SG), § 10–208,[6] governing the admission of evidence in a contested case in administrative hearings provides in pertinent part:

"(b) *Probative evidence.*—The agency may admit probative evidence that reasonable and prudent individuals commonly accept in the conduct of their affairs and give probative effect to that evidence.

(c) *Exclusions.*—The agency may exclude evidence that is:

(1) incompetent;

(2) irrelevant;

(3) immaterial; or

(4) unduly repetitious."

Clearly, the Department produced enough evidence to assure that the videotape had sufficient probative value and indicia of reliability and accuracy at least for an administrative hearing. Notwithstanding the relaxed evidentiary requirements in the administrative context, we believe that the videotape may have been properly authenticated even under the

---

**6.** Chapter 59, § 1 of the Acts of 1993 revised and renumbered several sections of the Administrative Procedures Act. Pursuant to that revision, Maryland Code (1984, 1995 Repl.Vol.), State Government Article, § 10–213 replaced what was formerly § 10–208, effective June 1, 1993. Since the administrative hearing on Cole's termination of employment was heard and decided by the ALJ in 1992, and the order of the Secretary of Personnel was dated January 18, 1993, we refer to § 10–208.

more stringent rules of evidence required for judicial proceedings.

We hold that an adequate foundation was established to admit the videotape into evidence, at least in an administrative hearing, in either of two ways: (1) under the "independent silent witness" theory of admissibility as probative, substantive evidence in itself; or (2) under the business records exception to the rule against hearsay, as part of an official record of the institution made and kept in the ordinary course of business. Hence, we uphold Cole's termination of employment by the ALJ and reverse the Court of Special Appeals.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THIS CASE TO THE CIRCUIT COURT FOR WASHINGTON COUNTY WITH DIRECTIONS TO REINSTATE THE DECISION OF THE SECRETARY OF PERSONNEL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*

Dissenting opinion by BELL, J.

BELL, Judge, dissenting.

In a well-reasoned opinion by Judge Marvin H. Smith, a former judge of this Court, the Court of Special Appeals held that the authentication of a video tape required "that a person with first-hand knowledge of the subject of the movie or video tape testify that it is a fair and accurate portrayal of the subject." *Department of Public Safety v. Cole,* 103 Md.App. 126, 134, 652 A.2d 1159, 1162 (1995) (quoting 5 Lynn McLain, Maryland Evidence § 403.6 at 322 (1987)). To like effect, McLain and the intermediate appellate court cited *Tobias v. State,* 37 Md.App. 605, 378 A.2d 698 (1977); 2 John W. Strong, *McCormick on Evidence,* § 214 (4th ed. 1992); 3 Charles C. Scott, *Photographic Evidence,* § 1294 (2nd ed. 1969); Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 1102 (2nd ed. 1993). Noting that, in the instant case, the video tape was admitted over the petitioner's objection, without any effort at

authentication, not to mention compliance with the "modern trend," McLain at 322, the court concluded that admission of the video tape was error. It thereupon affirmed the judgment of the Circuit Court for Washington County, which had reversed the ruling of the Administrative Law Judge in that regard. The Court of Special Appeals ordered the case remanded for further proceedings, including an attempt to authenticate the video tape.

The majority does not disagree with the authentication method addressed by the intermediate appellate court. Nor does it suggest that the video tape was authenticated in compliance with this method. The majority relies, instead, on an alternative method of authentication, the "silent witness" approach, to reverse the Court of Special Appeals and affirm the decision of the Administrative Law Judge.

Under the "silent witness" approach,

photographic evidence may draw its verification, not from any witness who has actually viewed the scene portrayed on film, but from other evidence which supports the reliability of the photographic product.

2 *McCormick on Evidence* § 214 at 15. That "other evidence" is the required "adequate foundation assuring the accuracy of the process producing [the video tape]." 3 *Wigmore on Evidence* § 790 at 219–20 (Chadbourn rev. 1970). The "silent witness" evidence must, of course, be a "reasonably accurate and honest representation ... of the facts it purports to represent," whether or not it is of the kind that is susceptible to eyewitness verification.[1] *See Sisk v. State,* 236 Md. 589,

---

1. An x-ray picture is an example of "silent witness" evidence that is not susceptible to eyewitness verification. 2 *McCormick on Evidence* § 214 at 14–15 (John W. Strong ed., 4th ed. 1992). *See also People v. Bowley,* 59 Cal.2d 855, 31 Cal.Rptr. 471, 474–75, 382 P.2d 591, 594–95 (1963). Where that is true, the foundation must address the accuracy of the process producing it, as we have seen. *See* 2 *McCormick on Evidence,* § 214 at 15; 3 *Wigmore On Evidence,* § 790, at 219–20 (Chadbourn rev. 1970); *People v. Doggett,* 83 Cal.App.2d 405, 188 P.2d 792, 795 (1948) (photographs not testimonially authenticated admitted on basis of ex-

592–93, 204 A.2d 684, 685 (1964). Therefore, the foundational predicate must also satisfy this prong of the test.

In the instant case, the petitioner denied that he committed the acts of excessive force with which he was charged, although he did acknowledge that he was depicted on the video tape. Nevertheless, no such foundational predicate for the introduction of the video tape was even attempted to be laid. No testimony was offered as to how the video tape process works, *see* 2 *McCormick on Evidence,* § 214 at 15 (authentication based on reliability of the process will require a foundation that "resemble[s] that required for the admission of the products of other scientific processes", *i.e.,* that the application of the present instance was a valid one); 3 *Wigmore on Evidence* § 790 at 220 (Adequate foundation assuring the accuracy of the process that produced the video tape must be established), that the camcorder used was operating properly, *see Fisher v. State,* 7 Ark.App. 1, 643 S.W.2d 571, 573 (1982) (noting that the owner testified to adjusting the unattended camera, checking to see that it was working properly and turning it on prior to the incident being recorded), or that the finished product had not been tampered with. *See People v. Doggett,* 83 Cal.App.2d 405, 188 P.2d 792, 795 (1948).

Acknowledging that a foundation must be laid, the majority holds that the testimony of Warden Galley was sufficient to support the introduction of the video tape. According to the majority, his competence to testify concerning the routine practices of the prison and, in particular, about cell extractions, including the fact that they are ordinarily video taped, sufficed. More particularly, the warden testified that the practice included labeling the video tape with the date, time, and the names of the inmates and officers involved, and storing the video tape in a separate envelope in a security vault, access to which is subject to a chain of custody form. This testimony, the majority says, satisfied the "silent witness" test.

---

pert photographer's testimony that they were not composites or otherwise altered).

I cannot agree. The warden laid the foundation for deciding that the extraction in this case was video taped. Whether the process which produced that video tape was accurate, or not, was in no way addressed. Indeed, the record is devoid of any evidence or testimony that the camcorder used to record the extraction was working properly. Nor is there is any indication that the video tape was not tampered with. The majority's bald statement that "the possibility of tampering with or distortion of the videotape was extremely remote," 342 Md. at 27, 672 A.2d at 1122, does not make it so. This is particularly so when the subject of the video tape denies engaging in the conduct depicted.[2]

The majority points out that this is an administrative proceeding. That fact does not relieve the State of its obligation of laying a proper foundation.[3] In this administrative hearing, no evidence whatsoever was presented tending to support the trustworthiness and reliability of the critical video tape. Indeed, no attempt was made to present such evidence.

In my view, the Court of Special Appeals appropriately resolved the issue. Accordingly, I dissent.

---

**2.** The majority states that "there was no suggestion that the video camera was working improperly or that the tape was altered." 342 Md. 12, 27, 672 A.2d 1115, 1122 (1996). It is true that no explicit argument was made to that effect; however, implicit in the petitioner's denial of wrongdoing is that the video tape is inaccurate. That, it seems to me, places on the proponent of the evidence the obligation of establishing its accuracy. No attempt was made to do so. Warden Galley was in no position to do so.

**3.** I also reject the alternative ground for decision advanced by the majority. In my view, characterizing a video tape as a "business record" does not relieve the proponent of the evidence of the obligation of authenticating that video tape. As I read the majority opinion, that is precisely what it intends. It thus assumes the point in issue—the accuracy of the process and the reliability of the depiction. That is not, however, the appellate or review function.